STATE OF CONNECTICUT *v.* JOSE CRESPO
(SC 15453)

Callahan, C. J., and Borden, Berdon, Norcott and Palmer, Js.

Argued January 21—officially released September 1, 1998

*Susan M. Hankins*, assistant public defender, for the appellant (defendant).

*Judith Rossi*, senior assistant state's attorney, with whom were *Maureen Keegan*, assistant state's attorney, and, on the brief, *John A. Connelly*, state's attorney, for the appellee (state).

*Opinion*

CALLAHAN, C. J. The defendant, Jose Crespo, appeals from a conviction of murder following a trial

by a three judge panel.[1] The conviction arose out of the May 24, 1994 strangulation death of the victim, Melanie Rieger. We affirm the defendant's conviction.

The panel reasonably could have found the following facts. The defendant and the victim had been involved in a relationship for three years, beginning when the victim was sixteen years old and the defendant was twenty-three years old. Throughout the course of their relationship, the defendant and the victim regularly had engaged in physically and verbally abusive behavior. On May 24, 1994, the defendant went to the home of the victim in Waterbury for a prearranged meeting. While there, the defendant and the victim engaged in a violent argument that led to the defendant's strangulation of the victim. The defendant subsequently took steps to conceal his crime. On the day after he killed the victim, however, the defendant informed his sister, Eva Pizarro, and brother-in-law, Jose Pizarro, what he had done, and they persuaded him to retain attorney Mark Kostecki. With the assistance of Kostecki, the defendant turned himself in to the authorities. The defendant has not denied that he caused the victim's death. Rather, he has consistently claimed that he did not intend to kill the victim, and that he was extremely emotionally disturbed when he killed her. Additional facts will be discussed where relevant.

---

[1] General Statutes § 54-82 provides in relevant part: "(a) In any criminal case, prosecution or proceeding, the party accused may, if he so elects when called upon to plead, be tried by the court instead of by the jury; and, in such case, the court shall have jurisdiction to hear and try such case and render judgment and sentence thereon.

"(b) If the accused is charged with a crime punishable by death or imprisonment for life and elects to be tried by the court, the court shall be composed of three judges to be designated by the Chief Court Administrator, or his designee, who shall name one such judge to preside over the trial. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly. . . ."

The defendant was charged by information with murder in violation of General Statutes § 53a-54a (a).[2] After a finding of competency and probable cause, the defendant waived his right to a jury trial and was tried by a three judge panel. The defendant was convicted of murder and sentenced to a term of imprisonment of sixty years. He appealed from the judgment of the trial court to this court pursuant to General Statutes § 51-199 (b).[3] In his appeal, the defendant claims that the trial court improperly: (1) found that the evidence of the defendant's intent to cause the victim's death was sufficient to find him guilty of murder beyond a reasonable doubt; (2) concluded that he had not proved his affirmative defense of extreme emotional disturbance by a preponderance of the evidence; and (3) failed to conduct an inquiry into an actual or potential conflict of interest between the defendant and his attorney, Kostecki, and to obtain the defendant's waiver of his right to conflict-free representation. Additionally, the defendant requests that we review the trial court's denial of his motion for articulation. We decline to address the merits of the defendant's request for review, and we affirm the judgment of conviction.

[2] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[3] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ." Section 51-199 (b) (3) has since been amended to provide for direct appeal

## I

We initially address the trial court's denial of the defendant's motion for articulation. The defendant argues that the trial court's judgment did not satisfy the requirements of Practice Book § 64-1 (a) (1), formerly § 4059, which requires that "in judgments in trials to the court in civil and criminal matters . . . the court shall, either orally or in writing, state its decision on the issues in the matter. The court shall include in its decision its conclusion as to each claim of law raised by the parties and the factual basis therefor. . . ." The defendant argues that the court's failure to provide the requested articulation setting forth the factual basis of its conclusions impeded his ability to present an effective appeal.

The defendant's claim is not reviewable on appeal. Practice Book § 66-5, formerly § 4051, governing motions for articulation, provides that "[t]he sole remedy of any party desiring the court having appellate jurisdiction to review the trial court's decision on the motion filed pursuant to this section or any other correction or addition ordered by the trial court during the pendency of the appeal shall be by motion for review under Section 66-7 [formerly § 4054]. . . ." Consequently, our review of a trial court's denial of a motion for articulation is exclusively by way of a motion for review pursuant to Practice Book § 66-7, formerly § 4054.[4] Moreover, the defendant already has obtained

to the Supreme Court only in a criminal proceeding involving a conviction for a capital felony. Public Acts 1997, No. 97-178, § 2.

[4] Practice Book § 66-7, formerly § 4054, provides: "Any party aggrieved by the action of the trial judge as regards rectification of the appeal or articulation under Section 66-5 may, within ten days of the issuance of notice of the order sought to be reviewed, make a written motion for review to the court, to be filed with the appellate clerk, and the court may, upon such a motion, direct any action it deems proper. If the motion depends upon a transcript of evidence or proceedings taken by a court reporter, the procedure set forth in Section 66-6 shall be followed. Corrections which the court

the review to which he is entitled. We previously granted his motion for review of the trial court's denial of his motion for articulation, but denied the relief requested. We will not provide the defendant the opportunity for a second review of an issue already conclusively decided.

## II

The defendant next claims that the state failed to produce sufficient evidence from which the trial court could have found beyond a reasonable doubt that he intended to cause the victim's death. He asserts, therefore, that the court improperly denied his motions for judgment of acquittal at the close of the state's case-in-chief and at the close of all the evidence. Consequently, he contends that reversal of his murder conviction is required. We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *James*, 237 Conn. 390, 435, 678 A.2d 1338 (1996). In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial

makes or orders made pursuant hereto shall be included in the prepared record in the same way in which, under Section 66-5, corrections made by the trial judge are included."

circumstantial evidence. . . . *State* v. *Brown,* 235 Conn. 502, 510, 668 A.2d 1288 (1995).

"While the [trier of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [trier] to conclude that a basic fact or an inferred fact is true, the [trier] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . *State* v. *Newsome,* 238 Conn. 588, 617, 682 A.2d 972 (1996). Moreover, [i]n evaluating evidence that could yield contrary inferences, the [trier of fact] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. *State* v. *DeJesus,* 236 Conn. 189, 195, 672 A.2d 488 (1996). As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt; *State* v. *Ford,* 230 Conn. 686, 693, 646 A.2d 147 (1994); *State* v. *Patterson,* [229 Conn. 328, 332, 641 A.2d 123 (1994)]; *State* v. *Little,* 194 Conn. 665, 671–72, 485 A.2d 913 (1984); nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [trier of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty. . . . *State* v. *DeJesus,* supra, 196; see also *State* v. *Sivri,* 231 Conn. 115, 134, 646 A.2d 169 (1994)." (Internal quotation marks omitted.) *State* v. *Torres,* 242 Conn. 485, 489–90, 698 A.2d 898 (1997).

The state produced the following evidence at trial in support of its allegation that the defendant intended to cause the death of the victim. Throughout the course of their three year relationship, the defendant regularly engaged in physically abusive conduct toward the victim. The defendant had abused the victim in the presence of others, but he also had shown restraint before his family by walking away when the victim attempted to engage him in fights by striking him first. The defendant had stated to Monica Blanchette, the mother of his two children, that he was going to end up killing the victim. Additionally, the defendant had sought counseling from mental health professionals at Waterbury Family Services in an attempt to control his anger and his abuse of the victim.

One month before the victim's death, the defendant and the victim engaged in a heated argument over the telephone, which the victim recorded. After the victim ended the conversation, the defendant called back and left a message on her answering machine. In the message the defendant made several serious threats against the victim and her family.[5] On the day of the victim's death, the defendant went to the victim's home to pick her up so that she could accompany him to meet his mother, who was visiting from Puerto Rico. The defendant and the victim were sexually intimate while they were still at the victim's home. Soon thereafter, a violent argument erupted. During the course of the argument, the defendant strangled the victim, causing her death.[6]

[5] The defendant threatened to ruin the lives of the victim and her family, blow up her car, set a fire and "make a war." Although the victim immediately contacted the police regarding the threats, the police did not bring formal charges against the defendant for this incident, owing to the request of the victim and her family.

[6] The state medical examiner testified that the victim's injuries were consistent with manual strangulation.

After killing the victim, the defendant stole from the victim's home jewelry and a video camera, which he sold at a pawn shop. He then went to a self-serve storage facility, where he rented a storage bin for a period of one month. Later, he picked up his children and visited his mother. He then brought the children to the beach and returned them home to their mother. Later that evening, he retrieved the victim's body and returned to the storage bin that he had rented earlier in the day. There, he deposited the body, which he had placed in a hockey equipment bag. The next morning, knowing that the victim was dead, the defendant called her home and left a message on her answering machine stating that he would see her the following day and asking her to call him. It was not until later that day that the defendant told the Pizarros what had happened. They encouraged him to turn himself in. He agreed and accompanied them to Kostecki's office for that purpose.

On the basis of these facts, we conclude that the trial court reasonably could have concluded that the defendant intended to cause the victim's death. "In order to be convicted under our murder statute, the defendant must possess the specific intent to cause the death of the victim. General Statutes § 53a-54a. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. General Statutes § 53a-3 (11) . . . . *State* v. *Carpenter*, 214 Conn. 77, 82, 570 A.2d 203 (1990). Ordinarily, intent can only be proved by circumstantial evidence; it may be and usually is inferred from the defendant's conduct. Id. Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. *State* v. *Zdanis*, 182 Conn. 388, 396, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 201 (1981); see

also *State* v. *Carpenter*, supra, 82–83. Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct. *State* v. *Amarillo*, 198 Conn. 285, 300–304, 503 A.2d 146 (1986)." (Internal quotation marks omitted.) *State* v. *Montanez*, 219 Conn. 16, 20, 592 A.2d 149 (1991).

It is well settled that "[t]his court cannot substitute its own judgment for that of the [trier of fact] if there is sufficient evidence to support the [trier's] verdict. *State* v. *Tomasko*, 238 Conn. 253, 258, 681 A.2d 922 (1996). Accordingly, [w]e do not sit as a [thirteenth] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the [trier's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . Id. Finally, [i]n reviewing the . . . verdict, it is well to remember that [triers of fact] are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct. . . . *State* v. *Ford*, supra, 230 Conn. 693; *State* v. *Little*, supra, 194 Conn. 674; see also *State* v. *Zayas*, 195 Conn. 611, 620, 490 A.2d 68 (1985) ([i]t is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom)." (Internal quotation marks omitted.) *State* v. *Torres*, supra, 242 Conn. 490–91.

The court reasonably could have found from the defendant's act of manually strangling the victim that he intended the normal and natural consequences of that act, namely, the victim's death.[7] The history of

---

[7] The defendant argues that strangulation indicates less of an intent to kill as compared with the use of other weapons such as a gun or a knife.

violence and the defendant's threats against the victim's life, along with his recognition that he was likely to kill her, also support the finding that the defendant intended to cause the victim's death. Additionally, evidence that the defendant had exhibited control in the past to prevent a violent escalation of their fighting supports the finding that he intended her death on this occasion. The court also could have inferred that the defendant's substantial efforts to conceal the crime evinced a consciousness of guilt. The cumulative effect of the evidence was more than ample to enable the trier of fact to have found, beyond a reasonable doubt, that the defendant intended to cause the death of the victim.

### III

The defendant next argues that the trial court improperly found that he had not proved his affirmative defense of extreme emotional disturbance by a preponderance of the evidence. We disagree.

Section 53a-54a (a) provides in pertinent part that "it shall be an affirmative defense [to the crime of murder] that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ." We have held that "[e]xtreme emo-

---

We disagree. A gunshot or knife wound may result in instantaneous death and once the trigger is pulled or the knife thrust, there is no time for reflection or second thought. By contrast, strangulation requires the murderer to be in close proximity to the victim and to apply sustained pressure for some significant period of time, during part of which the victim will have lost consciousness. We conclude that strangulation, whether manual or by ligature, may be as indicative of an intent to kill as the use of a gun or knife.

tional disturbance 'is a mitigating circumstance which will reduce the crime of murder to manslaughter.'" *State* v. *Raguseo*, 225 Conn. 114, 122, 622 A.2d 519 (1993), quoting *State* v. *Asherman*, 193 Conn. 695, 730–31, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). Pursuant to General Statutes § 53a-12 (b), "[w]hen a defense declared to be an affirmative defense is raised at a trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence."

There is a substantial body of case law addressing the affirmative defense of extreme emotional disturbance. The seminal decision is *State* v. *Elliott*, 177 Conn. 1, 411 A.2d 3 (1979). "[W]e have repeatedly stated that our review of the conclusions of the trier of fact, whether it be a judge, a panel of judges or a jury, is limited. See, e.g., *State* v. *Brice*, 186 Conn. 449, 459, 442 A.2d 906 (1982) . . . . This court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The probative force of direct and circumstantial evidence is the same. . . . *State* v. *Evans*, [203 Conn. 212, 238, 523 A.2d 1306 (1987)]." (Citations omitted; internal quotation marks omitted.) *State* v. *DeJesus*, supra, 236 Conn. 200–201; *State* v. *Patterson*, supra, 229 Conn. 339; *State* v. *Blades*, 225 Conn. 609, 628, 626 A.2d 273 (1993); *State* v. *Steiger*, 218 Conn. 349, 378–79, 590 A.2d 408 (1991).

"For the defendant to have prevailed on this defense, he would have had to establish, by a preponderance of the evidence, that he had caused the death of the victim under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse measured from the viewpoint of a reasonable person

in the defendant's situation under the circumstances as the defendant believed them to be. *State* v. *Steiger*, supra, 218 Conn. 385; *State* v. *Patterson*, supra, 229 Conn. 341; *State* v. *Raguseo*, [supra, 225 Conn. 122]; *State* v. *Ortiz*, 217 Conn. 648, 656–58, 588 A.2d 127 (1991). To sustain his burden of establishing extreme emotional disturbance by a preponderance of the evidence, the defendant must persuade the trier of fact that: (1) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; (2) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (3) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feeling, such as passion, anger, distress, grief, excessive agitation or other similar emotions. *State* v. *Patterson*, supra, 341." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 236 Conn. 202–203.

Ultimately, "the question is whether upon the facts established and the inferences drawn therefrom the fact-finder could have reasonably concluded that the cumulative effect of the evidence failed to establish that the defendant acted under the influence of an extreme emotional disturbance for which there was a reasonable explanation or excuse. In sum, except where an abuse of discretion is clearly shown, the conclusion of a trial court should be affirmed so long as it is a reasonable one on the basis of the evidence adduced and the inferences drawn therefrom." *State* v. *Zdanis*, supra, 182 Conn. 391–92. "In the final analysis . . . the ultimate determination of the presence or absence of extreme emotional disturbance [is] one of fact for the trier, aided by the expert testimony of both sides, but left to its own factual determinations. . . ." (Citations omitted; internal quo-

tation marks omitted.) *State* v. *Steiger*, supra, 218 Conn. 383, quoting *State* v. *Zdanis*, supra, 395.

Two experts, Jeremy August, a forensic psychiatrist, and Walter M. Phillips, a clinical psychologist, testified on behalf of the defendant. After interviewing the defendant and members of his family, and after reviewing tests conducted at his request by Phillips, August concluded that the defendant was suffering from a borderline personality disorder with stress related dissociative features[8] that rendered him unable to control his anger in highly stressful situations. The defendant does not, however, suffer from a major psychiatric illness, psychosis or organic condition. Phillips also testified that the defendant suffered from a borderline personality disorder that prevented him from managing his anger and aggression. He also indicated that the defendant was driven to engage in conflictive relationships, such as that with the victim. Phillips opined that, unlike individuals who are not affected by this condition, the defendant was unable to experience feelings of love and anger toward one person at the same time, thus preventing him from tempering his anger toward the victim with love.

On the basis of the defendant's description to him of the events surrounding the homicide, August concluded that the defendant was unable to control his overwhelming feelings of anger on the day that he killed the victim due to several long-term and immediate stress factors.[9]

---

[8] "Dissociative" refers to what is colloquially known as the tendency to black-out or to be unable to remember an event or circumstances. The defendant told August during his psychiatric evaluation that he could not recall strangling the victim, but he could recall the circumstances leading up to the strangulation.

[9] We have concluded that "[a] homicide influenced by an extreme emotional disturbance . . . is not one which is necessarily committed in the 'hot blood' stage, but rather one that was brought about by a significant mental trauma that caused the defendant to brood for a long period of time and then react violently, seemingly without provocation." *State* v. *Elliott*, supra, 177 Conn. 7–8.

August opined that the stress of the following circumstances combined to cause the defendant to lose his ability to reason or to control his anger: (1) the defendant had been abused by his alcoholic father as a child; (2) the victim had received at least two abortions during her relationship with the defendant; (3) the defendant's mother had made a surprise visit from Puerto Rico; (4) the victim had intended to gain more independence from the defendant; and (5) the victim and the defendant had engaged in sexual intercourse immediately prior to the violent argument. According to August, these factors, all extant while the victim and the defendant were arguing, placed an unbearable strain on the defendant's tenuous grasp on his emotions and caused him to lose control of his anger and strangle the victim.

Although the state did not call its own experts to rebut the defendant's claim, it did cross-examine the two defense experts and presented other evidence to rebut the defendant's claim of extreme emotional disturbance.[10] "In a case in which the evidence is conflicting, it is the quintessential [fact finder] function to reject or accept certain evidence, and to believe or disbelieve any expert testimony. See, e.g., *State* v. *Forrest*, 216 Conn. 139, 148, 578 A.2d 1066 (1990); *State* v. *Zdanis*, [supra, 182 Conn. 395]." *State* v. *Raguseo*, supra, 225 Conn. 123; see *State* v. *Blades*, supra, 225 Conn. 629.

The state, by cross-examination and by independent evidence, rebutted several aspects of the basis of the

---

[10] Contrary to the defendant's suggestion, the state's failure to produce rebuttal experts does not require the trial court to conclude that he has proven his claim by a preponderance of the evidence. We repeatedly have stated that the trial court is not required to believe expert testimony in the absence of rebuttal experts. See *State* v. *DeJesus*, supra, 236 Conn. 201; *State* v. *Patterson*, supra, 229 Conn. 340; *State* v. *Blades*, supra, 225 Conn. 629; *State* v. *Steiger*, supra, 218 Conn. 379–81; *State* v. *Perez*, 182 Conn. 603, 608–10, 438 A.2d 1149 (1981).

expert opinions. There was no testimony other than that of August that the defendant was upset by his mother's visit. Indeed, the testimony of Blanchette and the defendant's sister both indicated to the contrary. There was no testimony, other than that of the defense experts, that the victim had intended to break off or curtail her relationship with the defendant. To the contrary, she had made plans to spend the day with him, and they had engaged in sexual intercourse immediately prior to the fight that led to her death. Even if the victim had stated during the course of the ensuing argument that she wanted to end the relationship, there was evidence that she frequently had broken off the relationship only to reunite later. The evidence that the defendant was traumatized by the victim's decision to have an abortion on at least two occasions also was conflicting. At least the first abortion was performed with the consent and participation of the defendant, and there was no evidence that the defendant objected to the second abortion.

The information upon which the experts based their opinions of the defendant's feelings and the events surrounding the homicide was gleaned from the defendant. There was no evidence that the experts challenged or independently verified his statements, which may have been self-serving. The court was not required to give this evidence persuasive weight.

Furthermore, the court was entitled to disbelieve the defendant when he told the experts that he could not remember killing the victim. Contrary to the defendant's assertion that there were other episodes in which he could not remember his violent conduct, the testimony indicated that he was able to recall prior violent fights with the victim. There was evidence of only one other circumstance in which the defendant purportedly had

experienced a memory lapse.[11] August testified, furthermore, that, in his experience as a forensic psychiatrist, memory loss is one of the most commonly used excuses for criminal conduct. It was reasonable, therefore, for the court to have discredited the expert testimony and to conclude that the defendant had not proved his claim of extreme emotional disturbance by a preponderance of the evidence.

Even if the court had accepted the experts' diagnosis of borderline personality disorder, it was not obliged also to accept the testimony that the defendant was in the grip of an extreme emotional disturbance when he killed the victim. It is well established that "the term 'extreme' refers to the greatest degree of intensity away from the norm for that individual." *State* v. *Elliott*, supra, 177 Conn. 10; see *State* v. *Austin*, 244 Conn. 226, 243, n.18, 710 A.2d 732 (1998); *State* v. *DeJesus*, supra, 236 Conn. 204. The trial court reasonably could have concluded that the defendant was not subjected to an extreme emotional disturbance because his violent reaction was not the *greatest degree of intensity away from* the norm. Circumstances were not significantly different from those surrounding any of the prior fights. August testified that the circumstances surrounding the homicide did not constitute an unusual emotional experience or circumstance. Fights of the same nature were a common and regular occurrence between the victim and the defendant. The defendant had obtained counseling for his anger and violence toward the victim. Additionally, there was evidence that the defendant was able to control his anger in similar situations. Members of his family testified that he never struck the victim in their presence. In situations where the victim initiated a fight and struck him, the defendant had left the room

---

[11] The defendant's sister testified that she had stopped him from striking his niece, and that he had apologized and responded that he could not remember why he wanted to strike the girl.

without striking back. We cannot say that the trial court improperly concluded that the defendant had not proved his claim of extreme emotional disturbance by a preponderance of the evidence.

## IV

Finally, the defendant asserts that he is entitled to a new trial because Kostecki, in representing him, had an actual conflict of interest, or alternatively, that Kostecki had a potential conflict of interest. The defendant further asserts that the trial court was or should have been aware of the conflict, or potential conflict, but failed to conduct an inquiry or to obtain a knowing and intelligent waiver of his right to conflict-free representation. He argues, therefore, that automatic reversal of his conviction is required because his sixth amendment right to effective assistance of counsel has been violated. We disagree.

The following additional facts are relevant to this issue. On the day after he killed the victim, the defendant met his brother-in-law, Jose Pizarro. At that time, the defendant informed Pizarro that he thought he had killed the victim. Subsequently, he also told the same thing to his sister, Eva Pizarro. At the recommendation of the Pizarros, the defendant agreed to turn himself in to the police. The Pizarros then accompanied the defendant to Kostecki's office for that purpose. After consultation with the defendant in the presence of the Pizarros, during which the defendant informed Kostecki that he had killed the victim and where the body was located, Kostecki contacted John Maia, an inspector in the office of the state's attorney. Kostecki advised Maia of what he had been told concerning the circumstances of the victim's death and the location of the body. Kostecki drafted a written consent to search the storage

bin where the body was hidden, which the defendant signed.[12] Kostecki turned the consent form over to the police and accompanied them in their search of the storage bin. The police opened the bin with a key provided to them by Kostecki. Kostecki informed the police that the individual from whom he had obtained the key was in his office. At that time, he did not refer to the defendant by name.

Inside the bin, the police observed a bag that was large enough to contain a body. Rather than continue the search, the police sought to secure a search warrant. The affidavit for the warrant included the information obtained by the police from Kostecki, statements of Jose Pizarro to the police regarding the defendant's confession and the location of the body, as well as certain aspects of the independent investigation of the police, including their observation of the size of the bag as well as their discovery of the fact that the defendant had leased the bin on the prior day. At trial, the defendant submitted a stipulation of facts to the court relating to Kostecki's participation in the initial investigation, which was admitted into evidence without objection.[13]

The defendant argues that these facts demonstrate an actual conflict of interest on the part of Kostecki,

---

[12] The consent to search the bin read as follows:

"This is to confirm that I have authorized my attorney, Mark Kostecki, to have officers of the Waterbury Police Department search my storage space (Unit 719) at the Storage USA, 770 West Main Street, Waterbury, CT. I have discussed this with my attorney.

/s/ Jose Crespo
Jose Crespo

/s/ Migdalia Rosario
Witness   Migdalia Rosario

Dated at Waterbury, this 25th day of May, 1994."

[13] The stipulation of facts provided as follows:

STIPULATION

"1. On May 25, 1994, at approximately 2:45 p.m., Attorney Mark Kostecki, 63 Central Avenue, Waterbury, Connecticut, contacted by telephone Inspector John Maia of the Waterbury State's Attorney's Office.

or, at a minimum, a potential conflict of interest of which the court should have been aware and that it should have addressed. The purported potential conflict of interest between the defendant and his attorney allegedly arose out of Kostecki's participation in the initial investigation leading to the defendant's arrest. According to the defendant, Kostecki's participation gave rise to the possibility that Kostecki might have been called as a witness either on behalf of or against the defendant, creating the potential for a conflict of interest.[14] Additionally, the defendant argues that, by

"2. Attorney Kostecki informed Maia that he received information that there was a body located in a storage bin at Storage USA in Waterbury, Connecticut. He also informed Maia that the keys to the bin were in his possession.

"3. Upon Maia's arrival at 63 Central Avenue, Waterbury, Connecticut, Attorney Kostecki further informed Maia that the body was in storage bin #719 at Storage USA in Waterbury, Connecticut.

"4. Prior to leaving 63 Central Avenue, Waterbury, Connecticut, Attorney Kostecki had prepared a written consent to search storage bin #719 at Storage USA. Said consent form was signed by Jose Crespo and turned over to Waterbury police detective Mark Deal.

"5. At Storage USA, 770 West Main Street, Waterbury, Connecticut, Attorney Kostecki handed two keys to Waterbury police officer Michael Silva.

"6. Upon Maia's question to Attorney Kostecki concerning from whom he received the keys, Attorney Kostecki stated that the person who turned over the keys to him was at his law office on 63 Central Avenue, Waterbury, Connecticut.

| FOR THE STATE | FOR THE DEFENDANT |
| OF CONNECTICUT | JOSE CRESPO |
| /s/ Maureen M. Keegan | /s/ Mark Kostecki . |

| Maureen M. Keegan | Mark Kostecki |
| Assistant State's Attorney | |
| Judicial District of Waterbury" | |

[14] Rule 3.7 (a) of the Rules of Professional Conduct provides:

"A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

"(1) The testimony relates to an uncontested issue;

"(2) The testimony relates to the nature and value of legal services rendered in the case; or

"(3) Disqualification of the lawyer would work a substantial hardship on the client."

placing the stipulation of facts into evidence, Kostecki did, in fact, testify against his interests, creating an actual conflict of interest. Although we recognize that this is an unusual set of circumstances, we are not persuaded by either of the defendant's arguments.

"The sixth amendment to the United States constitution as applied to the states through the fourteenth amendment, and article first, § 8, of the Connecticut constitution,[15] guarantee to a criminal defendant the right to effective assistance of counsel. *Powell* v. *Alabama*, 287 U.S. 45, 69, 53 S. Ct. 55, 77 L. Ed. 158 (1932); *Festo* v. *Luckart*, 191 Conn. 622, 626, 469 A.2d 1181 (1983). Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest. *Wood* v. *Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981). *Festo* v. *Luckart*, supra, 626–27. . . . [O]ne of the principal safeguards of this

The Rules of Professional Conduct establish the guidelines for our determination of what constitutes a conflict of interest, and we properly look to them for guidance in determining whether a conflict exists that would impair the defendant's sixth amendment right to counsel. *State* v. *Webb*, 238 Conn. 389, 417–19, 680 A.2d 147 (1996). We have interpreted rule 3.7 to require an attorney to withdraw if he or she *"reasonably foresees* that he will be called as a witness to testify on a *material* matter . . . ." (Emphasis added; internal quotation marks omitted.) Id., 417.

[15] Although the defendant refers to a violation of his rights under article first, § 8, of the Connecticut constitution, he has failed to provide an independent analysis of the state constitutional issues. See *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992) (setting forth appropriate factors to be addressed when raising state constitutional claim). "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . . *State* v. *Robinson*, 227 Conn. 711, 721–22, 631 A.2d 288 (1993); see also *State* v. *Williams*, 231 Conn. 235, 245 n.13, 645 A.2d 999 (1994); *State* v. *Joyner*, 225 Conn. 450, 458 n.4, 625 A.2d 791 (1993); *State* v. *Rosado*, 218 Conn. 239, 251 n.12 588 A.2d 1066 (1991)." (Internal quotation marks omitted.) *State* v. *Ellis*, 232 Conn. 691, 692 n.1, 657 A.2d 1099 (1995).

right is the rule announced by this court that [a trial] court must explore the possibility of conflict . . . when it knows or reasonably should know of a conflict . . . . *Festo* v. *Luckart*, supra, 629." (Citations omitted; internal quotation marks omitted.) *State* v. *Martin*, 201 Conn. 74, 78–79, 513 A.2d 116 (1986).

There are two circumstances under which a trial court has a duty to inquire with respect to a conflict of interest: (1) when there has been a timely conflict objection at trial; *Holloway* v. *Arkansas*, 435 U.S. 475, 488, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978); or (2) when "the trial court knows or reasonably should know that a particular conflict exists . . . ." *Cuyler* v. *Sullivan*, 446 U.S. 335, 347, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). A trial court's failure to inquire in such circumstances constitutes the basis for reversal of a defendant's conviction. *Holloway* v. *Arkansas*, supra, 488. In the absence of an affirmative duty by the trial court to inquire, however, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance" in order to obtain reversal of his conviction. *Cuyler* v. *Sullivan*, supra, 348; *Festo* v. *Luckart*, supra, 191 Conn. 626–31.

The defendant did not raise any objection to his attorney's representation at trial. He seeks review, however, pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 233 (1989), or the plain error doctrine pursuant to Practice Book § 60-5, formerly § 4061.[16] In *Golding*, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the

---

[16] Practice Book § 60-5, formerly § 4061, provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." Id., 239–40. Moreover, we will review an unpreserved claim under the plain error doctrine only in "those truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Austin,* supra, 244 Conn. 241; *State* v. *Ortiz,* supra, 217 Conn. 659–60.

We conclude that neither of the defendant's claims, namely, that there was an actual conflict or that the court failed to inquire into a potential conflict, meets the requirements of *Golding.* For the reasons discussed subsequently, the defendant's initial claim, that an actual conflict of interest affected his representation, fails under the first prong of *Golding* for lack of an adequate record. The defendant's second claim, that the trial court failed to inquire into a potential conflict of interest, fails under the third prong of *Golding* because the defendant has not demonstrated that the trial court was under a duty to inquire such that its failure to do so evidences the clear existence of a constitutional violation that clearly deprived him of a fair trial. Additionally, we cannot determine, from the record, whether Kostecki impugned the fairness and integrity of the trial by acting contrary to the defendant's interest so as to constitute plain error. Consequently, we will not review the defendant's claims of ineffective assistance of counsel on direct appeal.

Almost without exception, we have required that "a claim of ineffective assistance of counsel must be raised

by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim. *State* v. *Leecan*, 198 Conn. 517, 541, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986)." *State* v. *Munoz*, 233 Conn. 106, 131 n.16, 659 A.2d 683 (1995); *State* v. *Roman*, 224 Conn. 63, 65 n.2, 616 A.2d 266 (1992), cert. denied, 507 U.S. 1039, 113 S. Ct. 1868, 123 L. Ed. 2d 488 (1993) ("defendant's claim of ineffective assistance of counsel must await an appropriate factual record, which can only be developed pursuant to a petition for habeas corpus"); *State* v. *Walker*, 215 Conn. 1, 9, 574 A.2d 188 (1990).[17] Moreover, we have stated as our preference "that *all* of the claims of ineffective assistance, those arguably supported by the record as well as others requiring an evidentiary hearing, be evaluated by the same trier in the same proceeding." (Emphasis added.) *State* v. *Leecan*, supra, 541. On the rare occasions that we have addressed an ineffective assistance of counsel claim on direct appeal, we have limited our review to allegations that the defendant's sixth amendment rights had been jeopardized by the actions of the *trial court*, rather than by those of his counsel. See *State* v. *Webb*, 238 Conn. 389, 414 n.24, 680 A.2d 147 (1996); *State* v. *Martin*, supra, 201 Conn. 83; *State* v. *Rodriquez*, 200 Conn. 685, 694–96, 513 A.2d 71 (1986). We have addressed such claims, moreover, only where the record of the trial court's allegedly improper action was adequate for review or the issue presented was a question of law, not one of fact requiring further evidentiary development. See *State* v. *Webb*, supra, 414 n.24[18] (court will

---

[17] A defendant might also pursue ineffective assistance of counsel claims in a petition for a new trial if it is raised in a timely manner. General Statutes § 52-582 provides: "No petition for a new trial in any civil or criminal proceeding shall be brought but within three years next after the rendition of the judgment or decree complained of."

[18] In *Webb*, we were faced with a pure question of law regarding whether two separate public defender offices within the state constituted a single firm for purposes of conflict of interest analysis. By concluding that they

review claim on direct appeal only when claim of trial court error "may be resolved *as a matter of law* upon review of the *existing* record" [emphasis added]); *State* v. *Martin*, supra, 83;[19] *State* v. *Rodriquez*, supra, 694–96.[20]

"In a case of a claimed [actual] conflict of interest . . . in order to establish a violation of the sixth amendment the defendant has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance. . . . *Phillips* v. *Warden*, 220 Conn. 112, 133, 595 A.2d 1356 (1991)."[21] (Internal quotation marks omitted.) *State* v. *Webb*, supra, 238 Conn. 422. We have described an attorney's conflict of interest as that which impedes his paramount duty of loyalty to his client. *Phillips* v. *Warden*, supra, 136–38. "Thus, an attorney may be consid-

did not, we determined that there was no possible conflict. *State* v. *Webb*, supra, 238 Conn. 421. It was unnecessary under that factual situation, therefore, to evaluate whether the court had a duty to inquire into the matter.

[19] We noted in *Martin* that "[b]y reviewing this claim, we do not repudiate our previous holding that a claim of ineffective assistance of counsel is normally inappropriate on appeal and must be reserved for postconviction habeas corpus relief." *State* v. *Martin*, supra, 201 Conn. 76 n.2. The record in *Martin* was sufficiently clear because the defendant's attorney requested to withdraw in light of the testimony of a witness that would have created a conflict of interest. Id., 77. The court summarily denied the attorney's motion and objection to continued representation without affording him a sufficient opportunity to explain the conflict. Id.

[20] In *Rodriquez*, the defendant alleged that the trial court had failed to inquire into a conflict of which it should have been aware because his attorney also had represented his wife, who was called as a witness. We concluded that the record did not reveal that the court should have been aware of any conflict because we did not perceive any of the wife's testimony as adverse to the defendant. *State* v. *Rodriquez*, supra, 200 Conn. 695.

[21] "If an actual conflict of interest burdens the defendant's counsel, the defendant need not establish actual prejudice. [*Phillips* v. *Warden*, supra, 220 Conn. 132–33.] The defendant need only demonstrate that the counsel's performance was adversely affected by the conflict." *State* v. *Webb*, supra, 238 Conn. 422, citing *Burger* v. *Kemp*, 483 U.S. 776, 785–88, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987), and *Phillips* v. *Warden*, supra, 220 Conn. 133, 139–40, 144–47.

ered to be laboring under an impaired duty of loyalty, and thereby be subject to conflicting interests, because of interests or factors personal to him that are inconsistent, diverse or otherwise discordant with [the interests] of his client . . . . *Government of the Virgin Islands* v. *Zepp*, 748 F.2d 125, 135 (3d Cir. 1984)." (Internal quotation marks omitted.) *Phillips* v. *Warden*, supra, 139.

Contrary to the defendant's assertion, we cannot conclude from this record that Kostecki's decision to admit the stipulation of fact concerning his contact with the police was the product of personal interests that were "inconsistent, diverse or otherwise discordant with" the defendant's interest. Id. The decision to admit the stipulation of facts may have been a reasonable trial strategy, properly discussed with and agreed to by the defendant, to admit uncontested and readily ascertainable facts. On the other hand, it may have been the equivalent of adverse attorney testimony prompted by Kostecki's desire to remain as the defendant's counsel, inimical to the defendant's best interests.[22]

---

[22] The defendant also claims that there was an actual conflict of interest because another attorney could have asserted attorney-client privilege with respect to the conversation between himself and Kostecki that led to the initial contact with the police and could have challenged his written consent to search the bin. As to the first matter, we note that the record is not sufficient to demonstrate whether the claim of attorney-client privilege was tenable. It appears from the testimony of Jose Pizarro that he and Eva Pizarro were present during the conversation between Kostecki and the defendant. If that is the case, that conversation is not privileged. Pizarro testified as follows:

"[Assistant State's Attorney]: And did an attorney come out?

"Jose Pizarro: Yes.

"Q. Did Mr. Kostecki come out?

"A. Yes.

"Q. And did Mr. Kostecki then take *you* into his office?

"A. Yes.

"Q. And then did *you* have conversations within that office?

"A. *Correct.*" (Emphasis added.)

With respect to the defendant's second claim, the decision not to challenge the consent also may well have been a matter of strategy. There is nothing

The admission of a stipulation relating facts in lieu of a defense attorney's testimony may, in some cases, constitute a conflict of interest. If the stipulation is the equivalent of an attorney testifying against his client, it is, ipso facto, an actual conflict of interest. See Rules of Professional Conduct 3.7. It does not follow, however, that every stipulation regarding an attorney's role in the representation of his client prior to trial is the equivalent of adverse testimony by the attorney. The use of a stipulation rather than an attorney's testimony has been accepted as a legitimate trial strategy when the information in the stipulation otherwise could have been presented by the prosecution, but the use of the stipulation was strategically preferable to the defendant and the state. For example, in *People* v. *Beals*, 162 Ill. 2d 497, 504–505, 643 N.E.2d 789 (1994), the defendant's attorney entered a stipulation relating the facts of an interview he had conducted with two witnesses regarding their testimony. The prosecution could have called the defendant's sister, who was present during the interviews, to testify to the facts contained in the stipulation. Id., 505. The court concluded that the use of the stipulation rather than his sister's testimony was in the best interest of the defendant, and, therefore, was not ineffective assistance of counsel. Id. There are many factors that must be evaluated in a determination of whether the use of a stipulation is a valid trial strategy or the equivalent of adverse attorney testimony. Such factors include whether the stipulation comports with the defendant's overall trial strategy, whether the stipulation is reasonable in light of the state's case, whether the state could have proven the facts in the absence of the stipulation, whether the attorney discussed the use of the stipulation with the defendant as a trial strategy,

in the record to indicate that a challenge to the consent or to the warrant would have been successful. The defendant is free, of course, to make such claims in an appropriate, posttrial proceeding.

and whether the defendant agreed with that strategy. Although that list is not exhaustive, it provides a suitable framework from which to evaluate the legitimacy of Kostecki's decision to enter the stipulation into evidence and the reasonableness of the court's failure to inquire into the possibility of a conflict.[23]

The record indicates that the state could have proved every relevant fact related in the stipulation.[24] It was, moreover, reasonable to believe, in the face of the defendant's several confessions as well as other compelling circumstantial evidence,[25] that the state would

---

[23] Contrary to the intimation in the dissenting opinion, we do not conclude that the trial court is excused from inquiring into actual or potential conflicts of which it is aware merely because a trail strategy is legitimate. Rather, we suggest only that the legitimacy and propriety of the trial strategy may lessen the likelihood that the trial court should be aware that the strategy is born of conflict. This goes only to the question of whether the trial court *should have known* that a potential conflict existed.

[24] The stipulation contains only one significant fact, namely, how the police came to be aware of the location of the body. See footnote 13 of this opinion. That fact, and every relevant fact contained in the stipulation, could have been obtained from an alternate source. The stipulation described Kostecki's conversation with the police to report the crime and his action while he accompanied the police during the initial search of the storage bin. It was carefully drafted to relate only what Kostecki told Maia, an inspector in the state's attorney's office, and certain actions and comments by Kostecki during the search. The court reasonably could have concluded that the inspector would have been able to testify to the substance of his conversation with Kostecki, and that Officers Michael Silva and Mark Deal could have testified to Kostecki's actions and comments at the storage bin. Consequently, the court reasonably may have concluded that, even without the stipulation, Kostecki would not have been a necessary witness, and the court had no reason to conclude that the stipulation was admitted solely to allow Kostecki to continue with his representation of the defendant. To the extent that it was admitted partially for that purpose, we cannot say that it demonstrates an actual conflict of interest. If both the defendant and his attorney wanted the continuation of the relationship, we cannot see how their interests actually or potentially diverged on that subject.

The defendant asserts that there was no alternate source for the information that the defendant had given the keys to Kostecki. There were myriad other sources, however, for the information regarding who was entitled to and originally had possession of the keys.

[25] The defendant confessed to Kostecki and to the Pizarros. The victim was the defendant's long-term girlfriend, whom he repeatedly had threat-

have had little trouble proving, independent of the stipulation, the commission of the homicide. The defendant's decision to rely exclusively on a mental state defense appears to have been the best, if not the only, viable trial strategy. The stipulation had little, if anything, to do with the defendant's mental state. Admission of the stipulation, indicating that the defendant had identified the location of the body and had provided the keys to the bin and had given his consent to search the bin, also may have been perceived as a wise tactic to demonstrate contrition, lending credibility to the defendant's claimed lack of intent. Additionally, the decision to admit the facts relating to the initial investigation may be viewed as a reasonable step to avoid additional testimony that might have had the negative effect of continually reinforcing the defendant's horrific conduct in the minds of the triers of fact.

These considerations suggest that use of the stipulation may have been a legitimate trial strategy. We cannot know for certain from the record, however, whether that was so, nor can we determine from the record whether Kostecki adequately explained to the defendant any possible conflict, if one existed, and obtained the defendant's consent to his continued representation.[26] We may speculate regarding the divergence of Kostecki's and the defendant's interests, but there are no facts from which we may conclude, as a matter of law, that a conflict actually existed. We have recognized that the "trial transcript seldom discloses all of the considerations of strategy that may have induced counsel to follow a particular course of action." *State* v. *Leecan*, supra, 198 Conn. 541. It is because of this typical

_____

ened, and the victim's body was found in a storage bin rented by the defendant on the day of the murder.

[26] We may presume, in the absence of evidence to the contrary, that an attorney has performed his ethical obligation to inform his client of any potential conflict. See *Cuyler* v. *Sullivan*, supra, 446 U.S. 347–48; *Festo* v. *Luckart*, supra, 191 Conn. 626–31.

lack of an adequate record that we ordinarily require a defendant to raise conflict of interest claims in a habeas corpus proceeding. Id. Although we cannot conclude with any degree of certainty from the record that the offer of the stipulation was an actual conflict of interest, we are equally unable to determine that it was not. Resolution of this issue, therefore, must await the development of an adequate factual record in an appropriate, posttrial proceeding.

The only remaining issue that properly may be resolved in this direct appeal is whether the trial court reasonably should have known, from the admission of the stipulation or other facts within its knowledge, that Kostecki had a potential conflict of interest. Such awareness by the court would give rise to a duty to inquire, and the failure to fulfill that duty constitutes reversible error. See *Cuyler* v. *Sullivan*, supra, 446 U.S. 347–48; *Festo* v. *Luckart*, supra, 191 Conn. 626–31.[27] We

---

[27] Contrary to the dissent's assertion that we do not understand the federal jurisprudence relating to possible conflicts of interest, we are well aware of the rule relating to automatic reversal articulated in *United States* v. *Levy*, 25 F.3d 146, 153–54 (2d Cir. 1994). We recognize that some federal courts have required automatic reversal where the reviewing court concludes that the trial court was or should have been aware of a possible conflict of interest. We also recognize that *Cuyler* may be read to support that proposition. Moreover, we do not dispute that automatic reversal would be the necessary result if we had concluded that the trial court knew or should have known of a possible conflict of interest. We do not expressly adopt that as the rule, however, because it is not necessary to reach that issue. As the dissent is well aware, we are unconvinced that the record demonstrates that the court knew or should have known of a possible conflict. Consequently, it is unnecessary for us to determine dipositively what the remedy would be in such circumstances.

Furthermore, although it is not essential to this opinion, we feel compelled to discount the dissent's argument that *Festo* must be overruled because it is contrary to the automatic reversal rule articulated in *Levy*. See footnote 10 of the dissenting opinion. We agree that *Festo* is not a model of clarity and may be misread to stand for that proposition. *Festo*, however, properly read, is not contrary to the automatic reversal rule. The procedural posture of *Festo* is quite distinct from any case in which the automatic reversal rule would apply. Automatic reversal is appropriate only on direct appeal from

conclude, however, that the record does not demonstrate that the trial court should have been aware of a potential conflict of interest between Kostecki and the defendant giving rise to a duty to inquire.

The stipulation did no more than admit readily ascertainable facts relating to an uncontested issue, that is, the defendant's commission of the homicide. The trial court reasonably may have viewed the use of the stipulation as a valid trial strategy rather than as the equivalent of adverse attorney testimony. There was no other evidence in the record from which the trial court was or should have been aware of a conflict of interest so as to compel the invocation of the extraordinary remedy of automatic reversal without a showing of prejudice to the defendant. The better course is to await the full evidentiary hearing of an appropriate, posttrial proceeding, which will determine whether, in fact, a conflict of interest deprived the defendant of the effective assistance of counsel.

We also conclude that the record is insufficient for us to say that the trial court should have known that Kostecki might be called as a witness, thus giving rise to a potential conflict of interest. Rule 3.7 of the Rules of Professional Conduct requires an attorney to withdraw if he or she *"reasonably foresees* that he will be called as a witness to testify on a *material* matter . . . ."" (Emphasis added; internal quotation marks

the judgment of conviction. *Festo* was a posthabeas appeal in which the habeas court expressly had concluded that no conflict of interest existed. While automatic reversal may be appropriate on direct appeal when the reviewing court concludes that the trial court had failed to inquire into a possible conflict of which it should have been aware, it is entirely inappropriate as a remedy in a posthabeas review. It would be incongruous to conclude that a conviction must be reversed because there may have been a possible conflict of which the court failed to inquire, notwithstanding that it had been conclusively determined that there was no conflict. Consequently, *Festo* is not inconsistent with the automatic reversal rule, and the dissent's suggestion that it should be overruled is without merit.

omitted.) *State* v. *Webb,* supra, 238 Conn. 417. It is firmly established that a trial court is entitled to rely on the silence of the defendant and his attorney, even in the absence of inquiry, when evaluating whether a potential conflict of interest exists. As noted in *Cuyler,* "[d]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent *special circumstances,* therefore, trial courts may assume either that [the potentially conflicted] representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. . . . [T]rial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. An attorney [facing a possible conflict] in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest *exists or will probably develop in the course of a trial.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *Cuyler* v. *Sullivan,* supra, 446 U.S. 346–47; see *United States* v. *Kindle,* 925 F.2d 272, 275–76 (8th Cir. 1991); *United States* v. *Crespo de Llano,* 838 F.2d 1006, 1012 (9th Cir. 1987); *Wilson* v. *Morris,* 724 F.2d 591, 594 (7th Cir. 1984); *State* v. *Webb,* supra, 238 Conn. 421 ("the defendant's attorneys' decisions not to seek to withdraw . . . support the conclusion that they did not possess an actual conflict of interest").

Furthermore, we have concluded that a defendant's current or former attorney may not be called to testify by either the defendant or the state in the absence of "compelling need." *Ullmann* v. *State,* 230 Conn. 698, 717–18, 647 A.2d 324 (1994). To meet this test, the party seeking to call the defense attorney must show that the testimony "is *necessary and not merely relevant* . . . ." (Emphasis added; internal quotation marks omitted.) Id., 717. Additionally, that party must demonstrate that it has exhausted "other available sources of

comparably probative evidence . . . ." Id. In light of the rigorous nature of this standard, the trial court reasonably could have concluded that Kostecki would not be called as a witness and, therefore, that no potential conflict existed in that regard.

A trial judge cannot be expected to be prescient. He or she cannot, upon the record before the court prior to trial, evaluate all possible trial strategies and conclude that the defendant's attorney has a conflict that would preclude him or her from pursuing the "best" strategy. Nor can the court be expected to know what witnesses are available to testify or what relevant facts must be presented. Many attorneys assist clients in making their confessions, and many attorneys properly insist on being present during a search that is likely to produce evidence of their client's guilt. This alone, however, does not create an inherent conflict any more than does the fact that an attorney represents two defendants in the same trial. See *Cuyler* v. *Sullivan,* supra, 446 U.S. 346–47; *Festo* v. *Luckart,* supra, 191 Conn. 627.[28] Before the trial court is charged with a duty to inquire, the evidence of a specific conflict must be sufficient to alert a reasonable trial judge that the defendant's sixth amendment right to effective assistance of counsel is in jeopardy. The remote possibility that Kostecki could have been called as a witness does not constitute a potential conflict of which the court reasonably should have been aware.

Finally, the defendant asserts that the trial court should have been apprised of Kostecki's potential conflict of interest because the state expressly had advised

[28] In *Cuyler,* the court refused to mandate an inquiry into every circumstance of joint representation, notwithstanding the fact that such circumstances are rife with the possibility that conflicts may arise. *Cuyler* v. *Sullivan,* supra, 446 U.S. 346–47. Similarly, we declined to adopt a per se duty to inquire rule in *Festo* because such an inquiry may be an undue intrusion by the court into the attorney-client relationship. *Festo* v. *Luckart,* supra, 191 Conn. 628.

the court of a conflict of interest.[29] The facts, however, do not support that conclusion. A review of the state's attorney's comment to the court reveals that it was neither an objection to Kostecki's representation of the defendant nor even an assertion that a conflict existed. Rather, it was a request by the state for time in which to evaluate whether Kostecki should remain as counsel and a request to set a date for a hearing in which to address the issue. The court did set a hearing date, but the record indicates that the prosecution never followed through in pursuing its potential objection. This may have left the court with the impression that the state had investigated the facts and the law, and had concluded that Kostecki's representation was not problematic. This further supports the conclusion that there was insufficient evidence of a potential conflict to trigger the trial court's duty to inquire.

Moreover, nothing in the prosecutor's statement would have alerted the trial court that the possibility of a conflict, cognizable from the bare facts of Kostecki's participation in the initial investigation, was likely to ripen into an actual conflict. The prosecutor's statement

---

[29] The statement to which the defendant refers was made by the prosecutor at the defendant's competency hearing, wherein the state's attorney informed the court: "And we are also asking for another date, perhaps two weeks from now, to investigate the propriety of Mr. Kostecki's representation of [the defendant]. As the court is aware, Mr. Kostecki was involved in bringing this matter to the attention of the police and there . . . may [be a] question, at least in the office of the state's attorney, as to whether it would be proper for Mr. Kostecki to be the attorney of [the defendant] at trial. So, we are asking for two weeks to look into this matter, but also that the court set a date for the probable cause hearing."

To the extent that a prosecutor's comments to the court regarding a defense attorney's continued representation are relevant to the trial court's duty to inquire, they go only to whether the trial court should have been aware of a potential conflict. We do not believe that a prosecutor's objection is the equivalent of a defendant's objection, which gives rise to an absolute duty to inquire pursuant to *Holloway* v. *Arkansas*, supra, 435 U.S. 488; *State* v. *Martin*, supra, 201 Conn. 83. We note that, in either event, the prosecutor did not make an objection.

conveyed no more to the court than that which the court already knew. Had the prosecutor indicated that the state intended to call Kostecki as a witness or that it believed that Kostecki had engaged in some misconduct during the initial investigation that might jeopardize the effectiveness of his advocacy, we would be faced with a different situation. As the record stands, however, there was nothing in the prosecutor's statement to indicate that Kostecki's participation in the initial investigation was improper or likely to require his testimony and, therefore, create an actual conflict of interest.

In sum, we conclude that the defendant has not demonstrated from the record that the trial court should have known that a potential conflict existed either by virtue of Kostecki's participation, at the behest of the defendant, in the initial investigation that led to the defendant's arrest, or by virtue of the admission of the stipulation of facts. Therefore, there is nothing in the record to establish that the trial court was under a duty to inquire. Because there was no duty to inquire, the defendant has failed to show that a constitutional violation clearly existed and clearly deprived him of his constitutional right to a fair trial. Furthermore, the record is inadequate to prove the existence of an actual conflict of interest that actually prejudiced the defendant. If the defendant wishes to pursue his claim of ineffective assistance of counsel, the proper forum in which to do so is a habeas corpus proceeding or by a petition for new trial in which a proper evidentiary record may be developed. *State* v. *Munoz*, supra, 233 Conn. 131 n.16; *State* v. *Leecan*, supra, 198 Conn. 541.

The judgment is affirmed.

In this opinion BORDEN, NORCOTT and PALMER, Js., concurred.

BERDON, J., dissenting. I would reverse the conviction of the defendant, Jose Crespo, for murder because

the trial court failed to inquire about a possible conflict of interest between him and his trial attorney, Mark Kostecki, and as a result the defendant's sixth amendment right to counsel was violated.

The undisputed facts relative to this issue are as follows. On May 25, 1994, one day after the victim was killed, the defendant contacted Kostecki for legal advice at the urging of his sister, Eva Pizarro, and her husband Jose Pizarro, in whom he had confided that he had killed the victim. After meeting with the defendant in his office on May 25, Kostecki called inspector John Maia of the Waterbury state's attorney's office and told him that a body was located in a storage bin at Storage USA in Waterbury, and that the keys to the bin were in his possession. After Maia arrived at Kostecki's office, during which time the defendant was present, Kostecki informed Maia that the victim's body was in storage bin 719. At the request of Maia, Kostecki prepared a written consent form to search the bin, which was signed by the defendant.

After Maia, Kostecki and several Waterbury police officers traveled to the defendant's storage bin, Kostecki handed the key to bin 719 to Officer Michael Silva. Silva opened the storage bin and observed three trash bags located on the floor of the bin, two small ones and one large one wrapped in packing tape. After obtaining a search warrant for the bags, the police opened the large bag and found the victim's body inside.

On May 26, 1994, the defendant was arraigned before the trial court and Kostecki filed a formal appearance on his behalf. On June 7, 1994, at the defendant's competency hearing, assistant state's attorney Maureen Keegan directed the court's attention to the problematic issue of Kostecki's continued representation of the defendant. Keegan requested the court to set a hearing

date "to investigate the propriety of Mr. Kostecki's representation of [the defendant]." She stated to the court: "As the court is aware, Mr. Kostecki was involved in bringing this matter to the attention of the police and there does [exist a] question, at least in the office of the state's attorney, as to whether it would be proper for Mr. Kostecki to be the attorney of [the defendant] at trial." The trial court set a date of June 22, 1994, for a hearing to determine Kostecki's ability to represent the defendant, but no such hearing was ever held.

On July 14, 1994, at the defendant's probable cause hearing, Kostecki continued to represent the defendant. The testimony presented at the probable cause hearing made numerous references to Kostecki's pivotal role in bringing the murder to the attention of the police and the state's attorney's office, and Kostecki's assistance in preparing the consent to search, which served as the basis for the police entry into the defendant's storage bin. The state also entered into evidence against the defendant a stipulation dated July 14, 1994, signed by Kostecki on behalf of the defendant and by Keegan (stipulation).[1] The stipulation set forth Kostecki's role

[1] The stipulation provides as follows:

"STIPULATION

"1. On May 25, 1994, at approximately 2:45 p.m., Attorney Mark Kostecki, 63 Central Avenue, Waterbury, Connecticut, contacted by telephone Inspector John Maia of the Waterbury State's Attorney's Office.

"2. Attorney Kostecki informed Maia that he received information that there was a body located in a storage bin at Storage USA in Waterbury, Connecticut. He also informed Maia that the keys to the bin were in his possession.

"3. Upon Maia's arrival at 63 Central Avenue, Waterbury, Connecticut, Attorney Kostecki further informed Maia that the body was in storage bin #719 at Storage USA in Waterbury, Connecticut.

"4. Prior to leaving 63 Central Avenue, Waterbury, Connecticut, Attorney Kostecki had prepared a written consent to search storage bin #719 at Storage USA. Said consent form was signed by Jose Crespo and turned over to Waterbury police detective Mark Deal.

"5. At Storage USA, 770 West Main Street, Waterbury, Connecticut, Attorney Kostecki handed two keys to Waterbury police officer Michael Silva.

in assisting the police in locating the victim's body and in securing the defendant's consent to search the storage bin.

On December 1, 1995, the defendant elected to be tried before a three judge court. On January 19, 1996, before the three judge court, the state commenced its case-in-chief against the defendant. After presenting its first two witnesses, the state offered the stipulation into evidence. The three judge court questioned the defendant[2] with respect to whether he voluntarily entered into the stipulation, but never questioned him about his trial counsel's possible conflict of interest. The three judge court followed this inquiry by reading the stipulation into the record, and asking the defendant if he understood the language contained therein. On this record, the three judge court accepted the stipulation and marked it as a full exhibit.

## I

## REVIEWABILITY

The majority argues that a claim of ineffective assistance of counsel based on a possible conflict of interest that is not raised at the time of trial must satisfy the four prongs of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 233 (1989). The claim of a possible conflict of interest on the part of trial counsel should be reviewed

---

"6. Upon Maia's question to Attorney Kostecki concerning from whom he received the keys, Attorney Kostecki stated that the person who turned over the keys to him was at his law office on 63 Central Avenue, Waterbury, Connecticut.

| FOR THE STATE | FOR THE DEFENDANT |
|---|---|
| OF CONNECTICUT | JOSE CRESPO |
| /s/ Maureen M. Keegan | /s/ Mark Kostecki |

| Maureen M. Keegan | Mark Kostecki |
|---|---|
| Assistant State's Attorney | |
| Judicial District of Waterbury" | |

[2] See footnote 8 of this dissent.

without the necessity of satisfying *Golding* for two reasons. First, an attorney who is willing to compromise his client's interests by proceeding as trial counsel in a trial in which he plans to act as an advocate and a witness cannot be expected to draw the trial court's attention to his possible conflict of interest with his client. Second, it would be anomalous to require the criminal defendant to bear the responsibility for recognizing and protecting himself against possible conflicts of interest from the attorney ostensibly representing him, when it is the trial court's duty, not the criminal defendant's, to ensure that the trial is fair and does not contravene the defendant's right to conflict-free representation. See *Wheat* v. *United States*, 486 U.S. 153, 161, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988).

But, more importantly, the majority avoids the issue of a possible conflict because of the third prong of *Golding*—that is, "the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial." *State* v. *Golding*, supra, 213 Conn. 240. The majority claims that the defendant does not satisfy this prong because he "has not demonstrated that the trial court was under a duty to inquire such that its failure to do so evidences the clear existence of a constitutional violation that clearly deprived him of a fair trial." The simple answer to this claim is that the majority is not correct. The more complete answer, as I point out in this dissent, is that this claim by the majority demonstrates its failure to understand the federal constitutional jurisprudence with respect to *possible* conflicts of interest.

## II

## CONSTITUTIONAL RIGHT TO CONFLICT-FREE REPRESENTATION

It is beyond debate that under the sixth amendment to the United States constitution; *Wood* v. *Georgia*, 450

U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981); and article first, § 8, of the constitution of Connecticut; *State* v. *Webb*, 238 Conn. 389, 417, 680 A.2d 147 (1996); *State* v. *Williams*, 203 Conn. 159, 167, 523 A.2d 1284 (1984); *Festo* v. *Luckart*, 191 Conn. 622, 626, 469 A.2d 1181 (1983); that where a constitutional right to counsel exists, "there is a correlative right to representation that is free from conflicts of interest." *Wood* v. *Georgia*, supra, 271, citing *Cuyler* v. *Sullivan*, 446 U.S. 335, 351, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980); *Holloway* v. *Arkansas*, 435 U.S. 475, 481, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978). The fundamental principle underlying the right to conflict-free representation is undivided loyalty to the client. "Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision." *Von Moltke* v. *Gillies*, 332 U.S. 708, 725–26, 68 S. Ct. 316, 92 L. Ed. 309 (1948); see also *Phillips* v. *Warden*, 220 Conn. 112, 132, 595 A.2d 1356 (1991) ("[i]t is axiomatic that the right to counsel is the right to effective assistance of counsel . . . [and] [a]s an adjunct to this right, a criminal defendant is entitled to be represented by an attorney free from conflicts of interest" [citations omitted; internal quotation marks omitted]); *Dukes* v. *Warden*, 161 Conn. 337, 345–46, 288 A.2d 58 (1971), aff'd, 406 U.S. 250, 92 S. Ct. 1551, 32 L. Ed. 2d 45 (1972) (client entitled to "undivided loyalty of the one upon whom he looks as his advocate and his champion").

A conflict of interest does not necessarily result in the disqualification of the attorney. Once the conflict or possible conflict comes to the attention of the trial court, either by disclosure of the attorney or upon circumstances or events which apprise the trial court of the possibility of such conflict, the trial court is obligated to conduct a searching inquiry to ascertain the nature and extent of the conflict. "[T]rial courts have

an independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment. *Wheat* v. *United States*, [supra, 486 U.S. 161]." (Internal quotation marks omitted.) *United States* v. *Levy*, 25 F.3d 146, 153 (2d Cir. 1994). Their duty of inquiry arises whenever they are "*sufficiently apprised* of even the possibility of a conflict of interest . . . ." (Emphasis added.) Id.; see *State* v. *Martin*, 201 Conn. 74, 79, 513 A.2d 116 (1986) ("[a trial] court must explore the possibility of conflict . . . when *it knows or reasonably should know of a conflict*" [emphasis in original; internal quotation marks omitted]).

Although the right to conflict-free representation usually arises in cases involving one attorney representing codefendants, "it is equally applicable in other cases where a conflict of interest may impair an attorney's ability to represent his client effectively." *State* v. *Williams*, supra, 203 Conn. 167; *Phillips* v. *Warden*, supra, 220 Conn. 135; *State* v. *Martin*, supra, 201 Conn. 80.[3]

[3] In *Phillips* v. *Warden*, supra, 220 Conn. 135, we noted other examples of conflicts that implicated the right to conflict-free representation: "*Wood* v. *Georgia*, supra [450 U.S. 267] (defendants' attorney paid by defendants' employer); *Mannhalt* v. *Reed*, [847 F.2d 576, 579 (9th Cir.), cert. denied, 488 U.S. 908, 109 S. Ct. 260, 102 L. Ed. 2d 249 (1988)] (defendants' attorney accused of criminal conduct by state's witness during cross-examination); *United States* v. *McLain*, 823 F.2d 1457 (11th Cir. 1987) (defendant's attorney under indictment for unrelated federal offense); *United States* v. *Iorizzo*, 786 F.2d 52 (2d Cir. 1986) (defendant's attorney had represented government's witness in prior related administrative proceedings); *Government of the Virgin Islands* v. *Zepp*, [748 F.2d 125, 134 (3d Cir. 1984)] (defendant's attorney subject to possible criminal liability for same transaction, and entered into factual stipulation, based on own knowledge, adverse to defendant); *United States* v. *Winkle*, 722 F.2d 605 (10th Cir. 1983); *United States* v. *DeFalco*, 644 F.2d 132 (3d Cir. 1979) (while defendant's appeal pending, defendant's appellate attorney under indictment and had entered guilty plea in same federal district court); *United States* v. *Hearst*, 638 F.2d 1190 (9th Cir. 1980), cert. denied, 451 U.S. 938, 101 S. Ct. 2018, 68 L. Ed. 2d 325 (1981) (defendant's attorney under contract to publish book regarding defendant's trial); *State* v. *Bolen*, 514 So. 2d 691 (La. App. 1987) (defendant's attorney was son of trial court judge); *Nunn* v. *State*, 778 S.W.2d 707 (Mo. App. 1989) (defendant's attorney became defense witness to impeach credibility of state's witness)."

I recognize that at times it is difficult to identify a conflict of interest in cases other than those in which the attorney represents codefendants in a trial. When, however, the circumstances of a particular case are placed in the context of the duty of loyalty the attorney owes to the client, the contours of the conflict are more clearly defined and identified. In *Phillips,* we pointed out the following: "That fundamental principle is that an attorney owes an overarching duty of undivided loyalty to his client. At the core of the sixth amendment guarantee of effective assistance of counsel is loyalty, perhaps the most basic of counsel's duties. *Strickland* v. *Washington,* [446 U.S. 668, 692, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]; see also *Cuyler* v. *Sullivan,* supra, [446 U.S.] 356 (Marshall, J., dissenting). Loyalty of a lawyer to his client's cause is the sine qua non of the Sixth Amendment's guarantee that an accused is entitled to effective assistance of counsel. *United States* v. *Aiello,* 814 F.2d 109 (2d Cir. 1987). That guarantee affords a defendant the right to counsel's undivided loyalty. *Mannhalt* v. *Reed,* [847 F.2d 576, 579 (9th Cir.), cert. denied, 488 U.S. 908, 109 S. Ct. 260, 102 L. Ed. 2d 249 (1988)]; see also *Fitzpatrick* v. *McCormick,* 869 F.2d 1247, 1251 (9th Cir.), cert. denied, 493 U.S. 872, 110 S. Ct. 203, 107 L. Ed. 2d 156 (1989) (right to effective assistance of counsel premised on right to counsel's undivided loyalty); *United States* v. *McLain,* [823 F.2d 1457, 1464 (11th Cir. 1987)] (Model Code of Professional Responsibility EC 5-2 [1987] prohibits a lawyer from accepting employment if there is reasonable possibility that his personal interests or desires will adversely affect advice or services to be rendered); *Government of the Virgin Islands* v. *Zepp,* [748 F.2d 125, 135 (3d Cir. 1984)] (Model Code of Professional Responsibility proscribes conflicts of interest in order to avoid interference with counsel's fiduciary obligations to maintain undivided loyalty); *Dukes* v. *Warden,* [supra, 161 Conn.

345–46] (client entitled to undivided loyalty of the one upon whom he looks as his advocate and his champion)." (Internal quotation marks omitted.) *Phillips* v. *Warden*, supra, 220 Conn. 136–37. Although I believe that Kostecki had an actual conflict of interest with the defendant, for the purposes of this dissent I will focus solely on the possible conflict of interest.

## III

## POSSIBLE CONFLICT OF INTEREST

The problem of identification of an actual conflict of interest does not reach the same magnitude with respect to that of the possible conflict in this case. The possible conflict arose out of Kostecki's actions immediately following his initial meeting with the defendant. After being told by the defendant about the death of the victim and the location of her body, Kostecki informed the state's attorney's office of the exact location where the victim's body could be found. At the request of the Waterbury police department, Kostecki obtained the defendant's written consent for the police to search the storage bin. Kostecki later accompanied the police when they searched the bin. Indeed, it was on the basis of the information provided by Kostecki that the police were able to establish probable cause in order to obtain a search warrant to search the plastic bag located in the bin that contained the body of the victim, and to establish probable cause to arrest the defendant. In light of Kostecki's pivotal role in the initial investigation of the murder and the arrest of the defendant, and his furnishing of a signed stipulation to the state that recounted these actions in order to avoid being called as a witness against his client at the probable cause hearing and at trial, there is no other way to describe his relationship with the defendant than as one with at least a possible conflict.

The possible conflict of interest between Kostecki and the defendant becomes more vivid by hypothesizing that, instead of furnishing a written stipulation before the trial court, Kostecki was called as a witness by the state and testified at the probable cause hearing and at trial, while continuing to act as the defendant's trial counsel. Pursuant to rule 3.7 of the Rules of Professional Conduct,[4] attorneys generally are prohibited from acting as advocates at trials in which they are likely to be called as witnesses. Indeed, the commentary to rule 3.7 provides in relevant part: "Combining the roles of advocate and witness can . . . involve a conflict of interest between the lawyer and client. . . ." The conflict of interest "can arise whether the lawyer is called as a witness on behalf of the client or is called by the opposing party. . . ." Id. The fact that in the present case the testimony was embodied in a written stipulation does not make it less offensive to the right to conflict-free representation.

The majority, without any supporting authority, argues that not every stipulation relating facts in lieu of a defense attorney's testimony constitutes a conflict of interest. In 1984, the Third Circuit Court of Appeals concluded: "We have searched the cases carefully and have found no [other] instance where defense counsel was actually permitted to testify against his own client while purporting to continue in a representative capacity." *Government of the Virgin Islands* v. *Zepp*, supra, 748 F.2d 138. Although the majority argues today, in 1998, that it has found one case where defense counsel

---

[4] Rule 3.7 (a) of the Rules of Professional Conduct provides: "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

"(1) The testimony relates to an uncontested issue;

"(2) The testimony relates to the nature and value of legal services rendered in the case; or

"(3) Disqualification of the lawyer would work substantial hardship on the client."

was permitted to continue in the dual role of advocate and witness in a client's trial, that case is inapposite to the present one. The case the majority cites, *People* v. *Beals*, 162 Ill. 2d 497, 643 N.E.2d 789 (1994), is noticeable for what it does not involve, a stipulation entered to avoid the need for the defense attorney to testify. Instead, *Beals* involved, as the Illinois Supreme Court noted, the admission of a stipulation that "prevented the State from calling the defendant's own sister as a witness against the defendant," not the defendant's own attorney. Id., 505.

In the present case, once the state offered to admit the signed stipulation before the three judge court, Kostecki had become, in effect, a witness for the state. At that point, there was an unacceptably high risk that the defendant's right to a fair trial would be compromised if Kostecki was allowed to simultaneously "labor in the disparate vineyards of testimony and of advocacy." *United States* v. *Gomez*, 584 F. Sup. 1185, 1190 (D.R.I. 1984) (attorney who translated waiver of rights form for codefendants, obtained their assents thereto, witnessed their signatures, and served as interpreter for one codefendant's confession must be disqualified); see also *United States* v. *Diozzi*, 807 F.2d 10, 12–13 (1st Cir. 1986) ("[a]ttorneys could not serve the dual roles of defense counsel and sworn government witnesses in the same trial"); *United States* v. *Ellison*, 798 F.2d 1102, 1107 (7th Cir. 1986), cert. denied, 479 U.S. 1038, 107 S. Ct. 893, 93 L. Ed. 2d 845 (1987) (counsel breached duty of loyalty by testifying for prosecution at defendant's plea revocation hearing); *Uptain* v. *United States*, 692 F.2d 8, 9 (5th Cir. 1982) (defendant denied right to counsel because attorney testified for prosecution at bail jumping trial).

Indeed, in the majority's discussion of whether there was an actual conflict of interest between Kostecki and the defendant, as a result of the admission of the

stipulation, it concedes that there was a potential conflict of interest. Specifically, the majority concludes that the issue should be raised by a petition for new trial or in a habeas corpus proceeding because, in part, it cannot "determine from the record whether Kostecki adequately explained to the defendant *any possible conflict*, if one existed, and obtained the defendant's consent to his continued representation." (Emphasis added.)

## IV

### TRIAL COURT'S KNOWLEDGE

Despite the existence of the stipulation, the majority argues that the trial court had no duty to inquire about a possible conflict of interest because the record was void of any evidence that would cause the court reasonably to conclude that a possible conflict existed between Kostecki and the defendant. I disagree.

The possible conflict of interest between Kostecki and the defendant is obvious from the record at each stage of the defendant's criminal proceedings—from arraignment to trial. The file before the trial court at the defendant's May 26, 1994 arraignment, consisting of two search warrant applications and one arrest warrant application,[5] disclosed that Kostecki's revelations to the state's attorney's office and to the Waterbury police instigated the investigation of the defendant. Indeed, one of the applications for a search warrant included the following references to Kostecki's involvement: "Attorney Kostecki said that he was representing [the

---

[5] Practice Book § 593A, now Practice Book (1998 Rev.) § 36-2, provides in relevant part: "All affidavits submitted to the judicial authority in support of the application for an arrest warrant and from which a determination of probable cause for the issuance of an arrest warrant has been made shall be filed with the clerk of the court together with the return of the arrest warrant pursuant to Sec. 972 and thereafter remain a part of the court file. . . ."

defendant] . . . and that his client told him there was a body in the storage bin at Storage USA . . . . [A]t the request of the Waterbury state's attorney's office, [Kostecki] had his client, [the defendant] authorize [Kostecki] and members of the Waterbury police department to search unit number 719 . . . ." The application for the arrest warrant included the statement that "Kostecki said that his client rented the bin and he had both keys in his possession." At the very least, the trial court reasonably should have foreseen that Kostecki, who was a witness to the critical facts concerning his procurement of the defendant's keys to the storage bin and of the defendant's consent to search the storage bin, would be called on behalf of the state to testify at trial with respect to these facts. Therefore, at the time of the arraignment, the trial court should have been aware of the possible conflict of interest created by Kostecki's continued representation of the defendant.

The trial court could not avoid learning of the potential conflict at the defendant's competency hearing on June 7, 1994. At that time, assistant state's attorney Keegan explicitly directed the trial court's attention to the possible impropriety. See *Wood* v. *Georgia*, supra, 450 U.S. 272–73 ("[a]ny doubt as to whether the court should have been aware of the problem is dispelled by the fact that the State raised the conflict problem explicitly and requested that the court look into it").

Moreover, the possible conflict should have been readily apparent to the trial court at the probable cause hearing when the state offered the stipulation[6] into evidence. Once the trial court had read the file and understood the relationship between Kostecki and the state's prosecution of this case, and had read the contents of the stipulation offered into evidence, it had enough information to know that Kostecki, at the very least,

---

[6] See footnote 1 of this dissent.

might be called as a witness at the defendant's trial. Indeed, by furnishing evidence in the form of a stipulation against the defendant at the probable cause hearing, Kostecki effectively testified against his client.

Finally, at trial, once the three judge court—which had before it all the preceding information concerning Kostecki's involvement in this case, Keegan's representation at the competency hearing, and the stipulation entered at the probable cause hearing—learned of the state's offer to admit the stipulation as part of its case-in-chief, it reasonably should have known that Kostecki had a possible conflict of interest with the defendant that triggered a mandatory inquiry.

On the basis of the record before the three judge court, the majority concludes that it is possible Kostecki's decision to admit the stipulation was motivated by his "desire to remain as the defendant's counsel, inimical to the defendant's best interests." Incredibly, after arriving at that conclusion, the majority argues that there was insufficient evidence in the record to alert the trial court to a possible conflict of interest. It bears repeating that the trial court's duty of inquiry arises whenever it is *"sufficiently apprised of even the possibility of a conflict of interest . . . ."* (Emphasis added.) *United States* v. *Levy,* supra, 25 F.3d 153. Clearly, if the record in the present case is sufficient to apprise the majority that Kostecki may have had an actual conflict of interest with the defendant, it was sufficient to apprise the three judge court of the possibility of a conflict.

V

FAILURE TO INQUIRE

I next address whether the trial court and the three judge court met their duties of inquiry into the possibility of a conflict. When conducting an inquiry, "[t]he

court must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." Id. "An inquiry allows the trial judge to determine the precise nature of the conflict and how to proceed, i.e. whether to disqualify counsel, obtain a waiver from the defendant pursuant to [*United States* v. *Curcio*, 680 F.2d 881, 888–90 (2d Cir. 1995)],[7] or take no action. See [*United States* v. *Malpiedi*, 62 F.3d 465, 468 n.2 (2d Cir. 1995)]." *United States* v. *Stantini*, 85 F.3d 9, 13 (2d Cir. 1996); see, e.g., *Dawan* v. *Lockhart*, 31 F.3d 718 (8th Cir. 1994); *United States* v. *Levy*, supra, 25 F.3d 146. The inquiry must be meaningful. "To be meaningful, an inquiry must be thorough and searching. . . . [M]erely to ascertain whether the [defendant was] apprised of the inherent risks . . . is meaningless." (Citation omitted.) *Festo* v. *Luckart*, supra, 191 Conn. 628.

The record in the present case reveals that the trial court made no attempt to inquire about Kostecki's possible conflict of interest at the defendant's arraignment, competency hearing, or probable cause hearing. The record does reflect that the three judge court conducted an inquiry at trial when the state submitted the stipulation as a full exhibit. The inquiry of the three judge court, however, was not directed to the conflict of interest, but, rather, to whether the defendant voluntarily entered into the stipulation.[8] Indeed, the state concedes that the three judge court's inquiry "was not generated

---

[7] See footnote 13 of this dissent.

[8] The three judge court's inquiry included the following colloquy between Judge Murray, Kostecki and the defendant:

"Judge Murray: The court has reviewed this stipulation. Mr. Kostecki, the court has some questions for your client with regard to his entering into this stipulation. The court is now prepared to ask [the defendant] a series of questions.

"Mr. Kostecki: May I confer with my client first, Your Honor?

"Judge Murray: Of course.

by a suspicion of a conflict of interest, but was expressly designed . . . to ensure a valid waiver of the defendant's right against self-incrimination." The three judge court merely asked the defendant at trial: "Do you

"Mr. Kostecki: Thank you. Thank you, Your Honor.

"Judge Murray: Mr. Kostecki, if during these questions you have any concerns or objections, please indicate them to the court.

"Mr. Kostecki: I shall do so.

"Judge Murray: Mr. Crespo, the court wishes to make inquiry of you and has a series of questions that it wishes to address to you regarding this stipulation that's been filed here by the lawyer for the state and Mr. Kostecki earlier. Do you understand what I'm saying to you thus far, sir?

"[The Defendant]: Yes.

"Judge Murray: All right. First, do you understand, Mr. Crespo that you are not required to give any evidence against yourself?

"[The Defendant]: Yes.

"Judge Murray: Do you understand that you have an absolute right to remain silent during this trial?

"[The Defendant]: Yes.

"Judge Murray: Do you understand that the state of Connecticut has the burden to prove each element of the crime charged here against you beyond a reasonable doubt?

"[The Defendant]: Yes.

"Judge Murray: Do you understand that this stipulation which has been filed here is an agreement by you of the facts contained in the document?

"[The Defendant]: Yes.

"Judge Murray: Do you understand by entering into this stipulation you are giving up your right to silence and relieving the state of its burden of proving each of the facts contained and agreed upon by you in this stipulation?

"[The Defendant]: Yes.

"Judge Murray: Do you understand that by virtue of this stipulation, if accepted in this trial, that your attorney, Mr. Kostecki, has avoided becoming a witness in this case?

"[The Defendant]: I did not understand this question.

"Judge Murray: All right. I'll put it to you again, Mr. Crespo. Do you understand that by virtue of this stipulation document, if accepted by the court in this trial, that your attorney, Mr. Kostecki, has avoided becoming a witness in this case?

"[The Defendant]: Yes.

"Judge Murray: Do you have any questions about that question that I just put to you?

"[The Defendant]: No.

"Judge Murray: Mr. Crespo, do you understand that if it were not for your stipulation, your attorney, Mr. Kostecki, might have to testify and you would have the right in that event to cross-examine him?

understand that this stipulation which has been filed here is an agreement by you of the facts contained in the document?" The defendant replied in the affirmative. The court further queried the defendant: "Do you understand by entering into this stipulation you are giving up your right to silence and relieving the state of its burden of proving each of the facts contained and agreed upon by you in this stipulation?" The defendant again replied in the affirmative. The determination by the trial court and three judge court that the defendant voluntarily entered into the stipulation does not equate to making the defendant aware that there was a possible conflict, nor does it satisfy the court's required inquiry about the nature of the conflict.

Moreover, the record reflects that, even though the three judge court was aware that Kostecki's stipulation was a proxy for his testimony, it failed to explain to the defendant the ramifications of retaining Kostecki as his trial counsel. Instead, the three judge court merely asked the defendant if he understood "by virtue of this stipulation document, if accepted by the court in this trial, that your attorney, Mr. Kostecki, has avoided becoming a witness in this case?" Furthermore, there is nothing in the record to show that the defendant was ever advised by Kostecki that his representation was conflicted. Cf. *State* v. *Williams*, supra, 203 Conn. 163 n.3 (attorney represented that defendant fully apprised

"[The Defendant]: Yes.

"Judge Murray: Do you wish to enter this stipulation, at least in part, because you wish to keep Mr. Kostecki as your lawyer in this case?

"[The Defendant]: I didn't understand this question.

"Judge Murray: All right. I'll ask it to you again. Do you wish to enter this stipulation, at least in part, because you wish to keep Mr. Kostecki as your lawyer in this case?

"[The Defendant]: Yes.

"Judge Murray: I now wish, of course, with the aid of the interpreter, because the interpreter has aided the court throughout this trial thus far, to read this stipulation to you, Mr. Crespo, and thus read it into the record also."

of risks of decision to be represented by attorney with conflict of interest and risks were enumerated on record).

## VI

### AUTOMATIC REVERSAL

Although the Supreme Court of the United States has made it clear that when counsel has brought a possible conflict to the attention of the court, and the court fails to inquire about the nature of the possible conflict, the automatic reversal rule is applied; *Holloway* v. *Arkansas,* supra, 435 U.S. 484; *Glasser* v. *United States,* 315 U.S. 60, 76, 62 S. Ct. 457, 86 L. Ed. 2d 680 (1942); it has not held precisely that in the absence of disclosure by the attorney there is automatic reversal when the trial court knew or should have known about a possible conflict and fails to inquire. The Second Circuit Court of Appeals and other circuit courts of appeals, however, have held that the automatic reversal rule applies when the trial court knows or should have known of the possible conflict. See *United States* v. *Levy,* supra, 25 F.3d 153–54; *United States* v. *Crespo de Llano,* 838 F.2d 1006, 1012 (9th Cir. 1987); *United States* v. *Cirrincione,* 780 F.2d 620, 625 (7th Cir. 1985); *United States* v. *Burney,* 756 F.2d 787, 791 (10th Cir. 1985).

"When a possible conflict has been entirely ignored, reversal is automatic. . . . The automatic reversal rule applies . . . when a [trial] court has failed to fulfill its initial inquiry obligation. . . . As the Tenth Circuit has explained: The Sixth Amendment requires automatic reversal only when a trial court fails to conduct an inquiry after either a timely conflict objection . . . or if the court knows or reasonably should know a particular conflict exists. . . . *United States* v. *Burney,* [supra, 756 F.2d 791] . . . ." (Citations omitted; internal quotation marks omitted.) *United States* v. *Levy,* supra, 25 F.3d 153–54; *United States* v. *Crespo de Llano,* supra,

838 F.2d 1012; *United States* v. *Cirrincione*, supra, 780 F.2d 625. The automatic reversal rule is thus applicable not only when there is an actual conflict, but also when there is a possible conflict and the trial court fails to engage in an inquiry. "When a [trial] court learns of even the possibility of a conflict of interest, it must inquire into the details of the attorney's interests to determine whether the conflict is actual, potential, or nonexistent. . . . Failure to fulfill this obligation constitutes per se reversible error." (Citations omitted.) *United States* v. *Lussier*, 71 F.3d 456, 461 (2d Cir. 1995).

The Second Circuit Court of Appeals noted that the adoption of the automatic reversal rule for those potential conflicts that the trial court fails to inquire about is predicated on the following reasoning. "There are two related, though perhaps distinct, grounds for concluding that [a trial court's failure to meet its inquiry obligation] requires reversal [of the defendant's conviction]. The [trial] court's failure could itself be considered an independent constitutional violation that alone necessitates reversal. See *Hamilton* v. *Ford*, 969 F.2d 1006, 1011 (11th Cir. 1992) (reversal automatic when there is no inquiry because the trial court has failed to discharge its constitutional duty under *Holloway* to determine whether the defendants are receiving adequate assistance of counsel, a duty separate from the *Cuyler* framework[9]), cert. denied, 507 U.S. 1000, 113 S. Ct. 1625, 123 L. Ed. 2d 183 (1993). Alternatively, the absence of an inquiry by the [trial] court, and thus the absence of any account or record of the true nature of the alleged conflict, may require a presumption of the prejudice that a defendant must usually demonstrate

---

[9] The *Cuyler* framework refers to the United States Supreme Court's holding in *Cuyler* v. *Sullivan*, supra, 446 U.S. 348, that in cases in which the defendant raises no objection at trial, prejudice is presumed only if the defendant demonstrates "that an actual conflict of interest adversely affected his lawyer's performance."

to make out a claim of ineffective assistance of counsel. See *United States* v. *Marrera*, 768 F.2d 201, 205 (7th Cir. 1985) (when trial court fails to inquire into [an alleged] conflict, a reviewing court will presume prejudice upon a showing of possible prejudice), cert. denied, 475 U.S. 1020, 106 S. Ct. 1209, 89 L. Ed. 2d 321 (1986)." (Internal quotation marks omitted.) *United States* v. *Levy*, supra, 25 F.3d 153–54 n.7.

Accordingly, as a matter of federal constitutional law, reversal is automatic when the trial court fails to inquire about any possible conflict of interest that was raised by one or both of the parties, or that was so apparent on the record that the trial court knew or should have known it existed.[10]

## VII

## MAJORITY'S INCONSISTENCY

Finally, I must confess that the majority opinion, at best, confuses me. On the one hand, it appears the majority agrees that the automatic reversal rule is the standard to be applied in cases such as this where the trial court fails to inquire about a possible conflict of interest it reasonably should have known existed. The majority states as follows: "There was no other evidence in the record from which the trial court was or should have been aware of a *conflict of interest so as to compel the invocation of the extraordinary remedy of automatic reversal without a showing of prejudice to the defendant*." Although the majority does not cite *United States* v. *Levy*, supra, 25 F.3d 146, for this proposition, I conclude that its use of the phrase "automatic reversal" is meant to reference *Levy*'s discussion of this doctrine.

---

[10] To the extent that *Festo* v. *Luckart*, supra, 191 Conn. 630, is contrary to *United States* v. *Levy*, supra, 25 F.3d 153–54, that case must be overruled.

On the other hand, however, it appears the majority rejects the automatic reversal rule when it argues that, because the trial court reasonably could have viewed the stipulation as a valid trial strategy rather than as the equivalent of adverse testimony, it did not have a duty to inquire about the possibility that Kostecki—who was willing to stipulate to certain statements in support of the state's case in order to avoid being called as a witness by the state—had a possible conflict of interest with the defendant. A determination that the stipulation was a legitimate trial strategy clearly has no relevance to the trial court's duty to inquire, as set out in *Levy*, because the alleged legitimacy of the strategy does not excuse the court from inquiring into (1) whether the client approves the strategy, (2) whether the attorney has discussed with the client the ramifications of such a strategy in terms of the possible conflicts of interest involved, or (3) notwithstanding the approval of the client, whether the court should allow such conflicted representation to continue.[11] It is also irrelevant because, if a trial court fails to inquire, prejudice is presumed under the automatic reversal rule. There would be no need to analyze the propriety of the attorney's trial strategy in the manner that alleged attorney errors are analyzed under the standard set out in *Strickland* v. *Washington*, supra, 466 U.S. 668 (1984).[12] In applying the automatic reversal rule, appellate courts must concern themselves with whether the trial court was sufficiently apprised of a possible conflict, not with why the trial court may not have conducted its constitutionally mandated inquiry. I reach the unfortunate conclusion that because the majority is willing to engage

[11] See footnote 13 of this dissent.

[12] In *Strickland* v. *Washington*, supra, 466 U.S. 687, the United States Supreme Court held that in order for a petitioner to prevail on a claim of ineffective assistance of counsel, he must establish that: (1) the attorney's performance was deficient; and (2) the deficient performance prejudiced the defense.

in speculation as to why the trial court did not conduct an inquiry, it has rejected the automatic reversal rule set out in *Levy* simply to avoid its result.

Because the trial court and three judge court did not conduct an inquiry into the possible conflict of interest between Kostecki and the defendant, and because the trial court and the three judge court knew or should have known of the possible conflict, the defendant's conviction must be vacated under the "automatic reversal" rule. *United States* v. *Stantini*, supra, 85 F.3d 13; *United States* v. *Lussier*, supra, 71 F.3d 461; *United States* v. *Levy*, supra, 25 F.3d 154.[13]

[13] Even if the three judge court had met its duty of inquiry in this case, I would still reverse the judgment of the court because it failed to meet its "disqualification/waiver" obligation.

If, as a result of a trial court's inquiry, "the court discovers that the attorney suffers from a severe conflict—such that no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation—the court is obliged to disqualify the attorney . . . ." (Citation omitted.) *United States* v. *Levy*, supra, 25 F.3d 153. "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers. See *Morris* v. *Slappy*, [461 U.S. 1, 13–14, 103 S. Ct. 1610, 75 L. Ed. 2d 610] (1983); *Jones* v. *Barnes*, [463 U.S. 745, 103 S. Ct. 3308, 77 L. Ed. 2d 987] (1983)." *Wheat* v. *United States*, supra, 486 U.S. 159.

"If the court discovers that the attorney suffers from a lesser or only a potential conflict—such that a rational defendant could knowingly and intelligently desire the conflicted lawyer's representation—the court should follow the procedures set out in [*United States* v. *Curcio*, supra, 680 F.2d 888–90], in order to obtain directly from the defendant a valid waiver of his right to a non-conflicted lawyer . . . ." (Citation omitted.) *United States* v. *Levy*, supra, 25 F.3d 153; *State* v. *Williams*, supra, 203 Conn. 167–68; *State* v. *Tyler-Barcomb*, 197 Conn. 666, 670, 500 A.2d 1324 (1985), cert. denied, 475 U.S. 1109, 106 S. Ct. 1518, 89 L. Ed. 2d 916 (1986).

"The first task of the trial court is to alert the defendants to the substance of the dangers of representation by an attorney having divided loyalties in as much detail as the court's experience and its knowledge of the case will permit." *United States* v. *Curcio*, supra, 680 F.2d 888. In assessing the defendant's level of understanding of the risks of the conflict, "the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands

Moreover, "[b]ecause [the defendant's] right to conflict free representation applies to all critical stages of a criminal proceeding"; *State* v. *Cruz*, 41 Conn. App. 809, 812, 678 A.2d 506, cert. denied, 239 Conn. 908, 682 A.2d 1008 (1996); *Holloway* v. *Arkansas*, supra, 435 U.S. 489; the trial court's failure to inquire about the conflict of interest between Kostecki and the defendant at the probable cause hearing entitles the defendant to a new probable cause hearing.

Accordingly, I would reverse the defendant's conviction for murder and remand the case for a new probable cause hearing, and, if probable cause is found, for a new trial.

I dissent.

the details of his attorney's possible conflict of interest and . . . that he had discussed the matter with his attorney or if he wishes with outside counsel . . . ." (Internal quotation marks omitted.) Id., 889. If the trial court does not provide the defendant with a reasonable time to digest and contemplate the risks, "both the opportunity for the defendant to make a knowing and intelligent decision and the opportunity for the court to assess correctly whether such a decision has been made are minimized." Id., 890; see *United States* v. *Lussier*, supra, 71 F.3d 462 ("[t]o secure a valid waiver, the court must: (1) advise the defendant about potential conflicts; (2) determine whether the defendant understands the risks of those conflicts; and (3) give the defendant time to digest and contemplate the risks, with the aid of independent counsel if desired").