STATE OF CONNECTICUT *v.* MIA MCSWAIN
(AC 26956)

DiPentima, Lavine and Borden, Js.

Argued October 18, 2007—officially released January 15, 2008

*Lauren Weisfeld,* senior assistant public defender, for the appellant (defendant).

*Susann E. Gill,* senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *C. Robert Satti, Jr.,* senior assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Mia McSwain, appeals from the judgment of conviction, rendered after a jury

trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1).[1] The defendant claims that the trial court improperly (1) excluded evidence of her state of mind that was relevant to her defense of self-defense and (2) violated her federal and state constitutional rights to counsel of her choice for purposes of her sentencing proceeding. We affirm the judgment of the trial court.

The state originally charged the defendant with assault in the first degree and conspiracy to commit assault in the first degree. Before submitting the case to the jury, the court granted the defendant's motion for a judgment of acquittal on the conspiracy count. Thus, the state's information charged the defendant with causing serious physical injury to the victim, Betsy Ocasio, with a dangerous instrument, namely, a razor blade, in violation of § 53a-59 (a) (1). The jury found the defendant guilty, and the court sentenced her to a period of incarceration of eight years, execution suspended after five years, and five years of probation. This appeal followed.

The jury could reasonably have found the following facts. In September, 2003, Ocasio was the mother of a child by Raphael Valle, who had a new girlfriend, the defendant. Ocasio was still friendly, however, with Raphael's mother, Paula Valle, who was her child's grandmother. On September 15, 2003, Ocasio went to Marina Village, a housing project in Bridgeport, to visit Paula. While Ocasio was there, Raphael arrived, and she and he argued outside of Paula's first floor apartment. Raphael then called the defendant on his cellular telephone, and the defendant arrived soon thereafter. Ocasio went into Paula's apartment, and the defendant

---

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of . . . a dangerous instrument . . . ."

knocked loudly on both the back and front doors, calling for Ocasio to come out. Ocasio locked the doors.

After the defendant and Raphael left the area in Raphael's car, Ocasio and Paula went outside, and Raphael and the defendant then returned. The defendant left Raphael's vehicle and approached Ocasio, who was sitting on the front steps of Paula's apartment. The defendant asked Ocasio if she was going to hit her, and then the defendant began to swing her right hand at Ocasio's face, cutting her with what Ocasio assumed was a razor, although she did not actually see one in the defendant's hand and did not realize until later that she had been cut.[2] Ocasio kicked the defendant back with her legs, and they began fighting. Ocasio got on top of the defendant and ripped her shirt off, while the defendant continued to cut Ocasio's face. Meanwhile, several people from the neighborhood had gathered around the fighting women. The defendant then stopped fighting, walked to Raphael's car and left with Raphael. Paula took Ocasio to a hospital, where she received seventy-four stitches to her face and head. Her wounds were consistent with having been cut with a razor. She suffered pain and disfigurement as a result of these injuries.

I

The defendant first claims that the court improperly excluded her testimony that she offered to support her defense of the justified use of force to defend herself, as provided in General Statutes §§ 53a-16 and 53a-19.[3]

---

[2] Ocasio testified that when the defendant swung at her, she felt stings on her face and that it was not until after the fight was over that she realized that she was bleeding and had been cut.

[3] General Statutes § 53a-16 provides: "In any prosecution for an offense, justification, as defined in sections 53a-17 to 53a-23, inclusive, shall be a defense."

General Statutes § 53a-19 (a) provides in relevant part: "[A] person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force

More specifically, the defendant claims that the court (1) abused its discretion and (2) deprived her of her constitutional right to present a defense by excluding her testimony that she had been sexually assaulted on a prior occasion, which she offered to show that her fear of death or great bodily harm was reasonable. We disagree.

The following facts and procedural history are relevant to the defendant's claim. Shortly before the trial began, the defendant filed a request to charge on the issue of self-defense. In addition, prior to the offer in question, the defendant's attorney responded to an inquiry by the court regarding the relevance of certain evidence regarding a restraining order, arguing that it was relevant "[t]o prove the fact that our claim is self-defense, Your Honor, and my claim is that . . . Ocasio is so obsessed with Raphael Valle and [the defendant] that she was consistently harassing her to the point in the final end of everything, she attacked my client and my client had no . . . choice but to do what she did to her." Thus, the court was aware, prior to the offer in question, that the defendant's defense was self-defense.

Prior to the offer in question, the defendant testified as follows. Before the defendant and Raphael became involved with each other, Raphael had fathered a child with Ocasio, who was very jealous of the defendant and her relationship with Raphael. The defendant often went to Paula's apartment. For months, Ocasio had been telephoning the defendant, who called the police to complain about harassment. Ocasio had even harassed the defendant outside of the defendant's obstetrician's office, calling the defendant's baby a "nigger . . . ."

which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

There is no dispute that by swinging at Ocasio with a razor, the defendant used deadly physical force. See General Statutes § 53a-3 (4) and (5).

The defendant testified further that she and Raphael went to the court clerk's office and secured a restraining order against Ocasio. Subsequently, Raphael withdrew the order, but the defendant did not know that and believed that it was still in effect to protect her from Ocasio.

On the day before the fight, the defendant walked by Paula's apartment on the way to a store. Ocasio was there and yelled obscenities at the defendant, who ignored her and continued to walk to the store. On the day of the fight, the defendant walked to Paula's apartment. She found Ocasio sitting on the front step and decided to talk with her, to persuade Ocasio to keep the defendant out of any problems she had with Raphael. As she approached Ocasio, she saw that Ocasio had a hammer in her hand and was tossing it from hand to hand in a threatening manner. The defendant asked Ocasio if she was going to hit the defendant with the hammer. Ocasio responded by pushing the defendant backward, kicking her in the chest, which caused her to fall to the cement sidewalk, and jumping on top of her and hitting her repeatedly with her hands while the defendant was flat on her back. Ocasio then put all of her weight on the defendant, with her knee on the defendant's chest. The defendant tried to get away from Ocasio but could not because Ocasio's weight was on her. At that point, they had moved across the cement sidewalk away from the front stairs.

The defendant testified further that Ocasio then began to rip the defendant's clothes off of her as Ocasio continued to hit her. She testified: "I had on a tank top and the whole side of my tank top was ripped like this and there was a little piece that was trying to survive on the top, and it somehow ended up around my neck. She ripped off my bra, which . . . fastened in the back, and the front of my bra was ripped open. She had broken my bra open. She continued to just push her weight on

me and her knee was in the center of my chest. I could not breathe. I could not get up. I never hit her. I just—all I tried to do was try to get away from her. Away from her. She just dragged my body across the ground. She just kept hitting me and hitting me, and she was pulling my shirt around my neck. She just kept pulling it and I could not breathe."

At that point, the defendant offered the testimony at issue. The defendant's counsel asked: "[N]ow, I want to take you back in time a little bit, a few years ago. Does this incident remind you of anything?" The state objected, and the court sustained the objection, stating: "I don't see the relevance." The defendant's counsel asked to be heard in the absence of the jury, and the jury was excused.

The defendant's counsel then stated: "Your Honor, the defendant was raped before, and I think it's very relevant as to what happened. There was a crowd standing there. Her shirt was ripped off. Her bra was wide open. People are cheering them on, cheering [Ocasio] on. I think it's very relevant." The state then objected on the grounds that it was irrelevant and that the prejudicial effect outweighed its probative value. The court then asked: "Why is it relevant that she was a victim of a crime?" The defendant's counsel stated that "[a]bout four years ago . . . [s]omebody threw her down the stairs on a cement floor, dragged her across the cement just like she was being dragged on cement . . . [r]ipped her clothes off in the exact same way." The court asked: "Except for a specific plea of sympathy to the jury, why is it relevant?" The defendant's counsel replied: "Because it tends to show what position, what state of mind she was in at the time."

The state repeated its objection of lack of relevance. The defendant's counsel stated that "[t]he definition, the very definition of relevancy is something that is

able to prove ever so slightly, which is able to tip the scales." The court replied: "Ever so slightly a material issue in the case." The defendant's counsel replied: "Right." The court then asked: "Why is her state of mind an issue?" The defendant's counsel replied: "Intent."

The court then turned to the prosecutor with the comment: "We're talking about whether or not it's relevant to the issue of intent." The prosecutor replied: "On the issue of relevance to intent, the only issue is ongoing sympathy, and it's not relevant to the intent. She can say that there was an incident in [her] life that happened earlier, but not the fact of it. I mean, the only way this comes in is really for sympathy, and it's got no other purpose in this case."

The court then ruled as follows: "The specific conduct of rape, at least at this point in the examination, I don't believe is relevant except on the issue of sympathy. If there was an unspecified, specific incident that caused her distress at this time, then . . . she may so relate to that. But we'll keep the incident out, at least at this point in time."

After the jury returned, the defendant continued to testify as follows. When asked what Ocasio did when the defendant was on the ground and Ocasio was on top of her, the defendant stated: "She just kept hitting me. She kept pulling my shirt around my neck. She kept putting her weight in my chest. I didn't have any clothes on. She just dragged me across the cement." When asked whether there were any spectators to the incident, the defendant stated: "There was a lot of people around cheering her on." When asked how this made her feel, the defendant replied: "When she was on top of me and when she was dragging my body across the ground, I felt like I was being raped by this girl. I felt exactly like I did when I was younger."[4]

---

[4] The state did not object to this testimony.

The defendant then testified as follows: "I wasn't trying to fight her back. I was just trying to get up and I couldn't. I couldn't breathe, and everything just started turning dark around me. And she had pushed my face in the ground, and I saw something by us that was shiny and I grabbed it and I closed my eyes and I just swung my arms and I just tried to get the girl off of me. I couldn't get her off of me. She was on top of me from the beginning when I fell down the stairs. She kicked me off the stairs. She was on top of me from that point to the very end and when she got off of me. I just closed my eyes and swung. I couldn't get up."

The defendant testified further that Ocasio then got off of her, and when she got up and ran away, Ocasio threw the hammer at her. She also testified that she did not learn that she had cut Ocasio until, as she was running away, someone in the crowd that had gathered yelled to her that she had cut Ocasio. She then went to a friend's house to clean up and stayed there because she was very upset.

A

With this factual and procedural background in mind, we turn first to the defendant's claim that the court abused its discretion in precluding her from testifying about the prior incident of rape. We reject this claim.

It is important to note the precise basis raised by the defendant on appeal for the admission of this testimony. That basis is that the testimony of the prior incident of rape was relevant to her claim of self-defense because it supported her assertion that she had a subjective fear of great bodily harm that was reasonable when viewed from the perspective of a reasonable person in the defendant's situation. See *State* v. *Prioleau*, 235 Conn. 274, 285–87, 664 A.2d 743 (1995) (defense of self-defense requires that jury determine whether defendant had subjective fear of great bodily harm and that such fear

was reasonable when viewed from perspective of reasonable person in defendant's situation). We agree with the state that the court's ruling did not constitute an abuse of discretion.

It is the obligation of the party offering the evidence to establish its relevance, and "[e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Vines*, 71 Conn. App. 359, 366, 801 A.2d 918, cert. denied, 261 Conn. 939, 808 A.2d 1134 (2002).

First, the defendant failed to convey clearly to the court the purpose for which she intended to use the evidence, even after the court indicated that it believed that the defendant's only purpose was to stir the jury's sympathy. When first asked by the court for the relevance of the proffered testimony, the defendant's counsel responded that "the defendant was raped before, and I think it's very relevant as to what happened." Counsel then stated that there was a crowd at the scene of the fight cheering Ocasio on and that Ocasio had ripped the defendant's shirt off and her bra open. Counsel then reiterated: "I think it's very relevant." At that point, however, despite the assertion of relevance by her counsel, the relevance of a prior rape of the defendant was not immediately apparent, and the court justifiably asked counsel: "Why is it relevant that she was a victim of a crime?"

Counsel then responded by stating that four years prior to this incident, the defendant had been dragged across cement, and her clothes had been ripped off "in the exact same way" and that the prior incident showed "what state of mind she was in at the time" of the present incident. At that point, arguably the court could have made the connection that the defendant urges on appeal, namely, that the state of mind to which her

counsel was referring was the subjective fear of great bodily harm in support of her claim of self-defense; this was not, however, the only connection or an inevitable connection for the court to make because the general reference to the defendant's "state of mind" could also have referred to the defendant's state of mind regarding the charge of assault in the first degree, namely, the intent to cause serious physical injury to another person. See footnote 1. Thus, the defendant's response was ambiguous, and the court was justified in asking: "Why is her state of mind an issue?"

Defense counsel's response was: "Intent." This response was also ambiguous, however. It could have signaled to the court, as the defendant suggests, her intent to defend herself and, therefore, by implication, her subjective fear of great bodily harm. It could also have been justifiably understood, however, to refer to the specific intent necessary to the charge of assault in the first degree. In fact, the specificity of this response, if anything, led the court in the latter direction. The defendant does not claim on appeal, moreover, that the prior incident was relevant to the issue of the specific intent necessary for the charge of assault in the first degree.

Furthermore, at no time during the proffer of the testimony at issue did the defendant's counsel refer specifically to the issue of self-defense. At no time did she alert the court to the connection between the proffered testimony and her subjective and reasonable fear of great bodily harm as a basis for her claim of self-defense.

Thus, the defendant did not sufficiently alert the court to the claim that she urges on appeal. Put another way, although arguably the court could have inferred that she was offering the testimony on the issue of her state

of mind for her defense of self-defense, it was reasonable for the court to understand the purpose of the proffer in accord with her specific second response, namely, on the issue of the specific intent necessary for the charge of assault in the first degree.

Indeed, the defendant's testimony immediately subsequent to the proffer confirmed the understanding that the evidence was being offered on the issue of the state of mind necessary for the charge of assault in the first degree. The gist of that testimony was that, as the defendant lay on the ground underneath Ocasio, perceiving that things were going "dark," and unable to breathe, she simply grabbed something shiny at hand and closed her eyes and swung her arms at Ocasio in order to get Ocasio off of her and that she did not even realize that she had cut Ocasio until she started to run away. This testimony, although consistent with her defense of self-defense, was also consistent with a claim that, although she had cut Ocasio, she did not have the requisite specific intent for the charge of assault in the first degree.

Second, the defendant did not avail herself of the opportunity to present evidence regarding the prior incident to the extent permitted by the court's ruling. As noted, during her offer of proof, the defendant testified about a number of events that occurred during the rape that were similar to the facts in the present assault, as alleged by the defendant. For example, the defendant testified that on both occasions, she was dragged across concrete and that her clothes were ripped off "in the exact same way," in front of a cheering crowd. After hearing this testimony, as well as arguments of counsel, the court ruled: "The *specific conduct of rape* . . . I don't believe is relevant except on the issue of sympathy. If there was an *unspecified, specific incident* that caused her distress at this time, then . . . she may so relate to that. But we'll keep the incident out . . . ." (Emphasis added.) The court was clearly concerned

that the defendant wanted to present only the fact of the prior rape to stir the jury's emotions. Its ruling addressed that concern by allowing the defendant to testify about "an unspecified, specific incident that caused her distress" during the prior incident, but not identify "the specific conduct of rape . . . ." In other words, the ruling allowed the defendant to testify that, for example, on a prior occasion she had been dragged across concrete and had her clothes ripped off while an onlooking crowd cheered. When the jury returned, however, rather than provide any testimony regarding these specific incidents, the defendant, instead, offered only the evidence that the court specifically ruled she could not, i.e., that she had been previously raped. The defendant testified: "I felt like I was being raped by this girl. I felt exactly like I did when I was younger." The state did not object to this testimony, and after the defendant testified to the occurrence of the rape, she moved on to other subjects.

Finally, the court's ruling that the defendant could not identify the prior incident as rape was provisional. The court stated: "The specific conduct of rape, *at least at this point in the examination*, I don't believe is relevant . . . . [W]e'll keep the incident out, *at least at this point in time*." (Emphasis added.) Therefore, the court allowed the defendant to offer the testimony that the prior incident was rape at a later point when her defense was more fully developed. This the defendant did not do.

Thus, the defendant's responses to the court's inquiries were insufficient to alert the court to the basis of her claim, namely, that the "state of mind" and "intent" to which she was referring were her subjective fear of great bodily harm resulting from the prior incident, as opposed to the state of mind necessary for the charge of assault in the first degree; the defendant was given the opportunity to testify about particular incidents that

occurred during the preceding incident and draw similarities to her encounter with Ocasio but did not; she was allowed the opportunity to raise the issue again after she had more fully developed her defense but did not; and, despite the court's ruling, she actually did testify that she had been raped and that she felt like she had on that prior occasion. Seen in that light, and in light of the defendant's obligation to establish the relevance of the evidence, we conclude that the court did not abuse its broad discretion in ruling that the evidence of the prior incident was irrelevant.

## B

We turn next, therefore, to the defendant's argument that even if she did not make her claim sufficiently clear in the court, the court's ruling deprived her of her constitutional right to present a defense and that she may prevail on this argument pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[5] We reject this argument because we conclude that the defendant has not established that the court's ruling deprived her of her constitutional right to present a defense.[6] Thus, she has failed to satisfy the third prong of the *Golding* test.

"When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present

---

[5] Pursuant to *Golding*: "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Blango*, 103 Conn. App. 100, 117, 927 A.2d 371, cert. denied, 284 Conn. 919, 933 A.2d 721 (2007).

[6] The defendant does not present an independent analysis of the constitutional right to present a defense under the state constitution. We therefore consider her claim only under the federal constitution. See *State* v. *Canales*, 281 Conn. 572, 592 n.12, 916 A.2d 767 (2007).

a defense. . . . A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . If the proffered evidence is not relevant, the defendant's right to confrontation is not affected, and the evidence was properly excluded. . . . At the same time, the right to present testimony that is relevant and material may not be denied arbitrarily." (Citation omitted; internal quotation marks omitted.) *State* v. *Griffin*, 98 Conn. App. 821, 826–27, 912 A.2d 520 (2006), cert. denied, 281 Conn. 915, 917 A.2d 999 (2007).

We agree with the defendant that the evidence of the prior incident was relevant to her defense of self-defense because, had she made her claim of relevance more clearly to the trial court, the evidence could have been admissible and could have supported the element of her defense of self-defense that she had a subjective fear of great bodily harm that was reasonable. We disagree, however, that the exclusion of this evidence deprived her of her right to present her defense.

The defendant testified in detail regarding her claim of self-defense. She testified about the history of animosity between her and Ocasio as a basis for a motive in Ocasio to have been the initial aggressor. In addition, in connection with her specific self-defense testimony regarding the fight, she testified as to facts supporting a subjective and reasonable fear of great bodily harm at the hands of Ocasio. She testified that Ocasio started the fight by attacking her, kicking her to the ground and jumping on top of her; that all of Ocasio's weight was on her with Ocasio's knee on her chest; that she was unable to get away from Ocasio, who dragged her across the cement and ripped her clothes off; that she could not breathe; that everything "started turning dark

around [them]"; and that she grabbed something shiny and swung at Ocasio in an attempt to get Ocasio off of her. In addition, she testified that as Ocasio was dragging her across the cement surface, she felt "like I was being raped by this girl. I felt exactly like I did when I was younger." This testimony, taken as a whole, presented to the jury evidence from which the defendant could argue, and the jury could find, that she had a subjective fear of great bodily harm that was reasonable. Furthermore, we note again that the defendant did not avail herself of the opportunity to compare the specific things that occurred during the prior incident with specific things that occurred during the defendant's confrontation with Ocasio. Thus, although the excluded evidence would have further supported the defendant's defense of self-defense in that regard,[7] in light of the fact that she did not avail herself of the opportunity to link the specifics of the prior incident to the incident in question, that she did not attempt to raise the issue of a prior rape in accord with the court's provisional ruling, and that she was able to testify as to the other underlying facts supporting her claim of a subjective fear of great bodily harm, we cannot conclude that the proffered evidence was so critical to her

---

[7] The defendant argues that the exclusion of the evidence was critical to her defense because it would have explained her feeling of being "raped" by another female. This argument, however, overlooks the chronology of her testimony. After the court's ruling, the defendant did testify, without objection, that she felt like she was being raped, similar to when she was younger. Thus, it was the defendant's subsequent testimony that arguably created the need for an explanation that was lacking because of the court's prior ruling. The defendant, however, did not at that point bring such a need to the court's attention and ask it to reconsider its provisional prior ruling in light of her subsequent testimony. Furthermore, the defendant did not take advantage of the court's ruling permitting her to testify about the prior incident without mentioning it as a rape. In light of the defendant's failure to do so, we reject her claim that the court's prior ruling deprived her of her constitutional right to present a defense on the basis of her subsequent testimony.

defense of self-defense that its exclusion deprived her of her constitutional right to present a defense.

## II

The defendant next claims that "in combination, the defendant's federal and state [constitutional] rights to counsel of choice and her rights as an indigent to have counsel appointed entitled her to remove incapable counsel and to have substitute counsel appointed." More particularly, she "seeks review of the trial court's [postverdict] motion to remove retained counsel and have the public defender appointed." We conclude that it is not appropriate to consider this claim on this appeal and that it must be presented, instead, by way of a petition for habeas corpus.

The following procedural history is relevant to the defendant's claim. At her initial arraignment in part B of the Superior Court and after the case was transferred to part A, the defendant was represented by the public defender. Subsequently, however, two private counsel entered appearances on her behalf[8] and jointly represented her at trial.

The jury returned its verdict on March 14, 2005. Thereafter, the defendant filed a motion for a judgment of acquittal and a new trial, which the court denied on April 14, 2005, and the court set a sentencing date of June 24, 2005. Meanwhile, however, on March 17, 2005, another private counsel filed an appearance for the defendant, but that counsel subsequently withdrew apparently because he also represented Raphael in a companion case.

On May 10, 2005, the trial counsel for the defendant moved to withdraw "because . . . the [d]efendant has

---

[8] The two counsel were Tina Sypek D'Amato and Nicholas D'Amato.

terminated [c]ounsel."[9] The motion also noted the sentencing date of June 24, 2005, and stated that "it is unclear that the [d]efendant is represented at this time." The court heard this motion on May 20, 2005. At that hearing, the defendant's counsel told the court that the defendant had decided to terminate her employment as counsel, that they "still communicate, but I believe she wants a public defender."

The court then addressed the defendant, who told the court that "I feel that I wasn't represented correctly. I feel that there was a lot that could have been done differently. Miss [Tina Sypek D'Amato, the defendant's trial counsel] could not get a lot of my evidence in. I also feel that I think it would be better for me to continue with a public defender. I think that things might happen differently if I were to have a public defender from the beginning. I don't know what else to say; that's basically it. There [were] a lot of comments that were made that I didn't like." The defendant then stated that her counsel had not subpoenaed certain witnesses that she had wanted to testify and complained about a comment that her counsel had made regarding whether to request an instruction from the court concerning lesser included offenses.

After further responses by her counsel and the state, the defendant addressed the court again. She reiterated her complaint that her counsel had not subpoenaed a certain witness and had not obtained a certain document until after the trial was over. She stated that her counsel "did not represent me at all in the way that an attorney should represent a client."

---

[9] Although the motion was filed only by attorney Tina Sypek D'Amato, the trial court, as well as the state and the defendant both in the trial court and on appeal, have treated it as having been filed by both counsel. Accordingly, we do the same but refer herein to Tina Sypek D'Amato as the defendant's counsel because she is the counsel who appeared in court on the motion to withdraw.

The court then denied the motion to withdraw and continued the case for sentencing on June 24, 2005. In doing so, the court stated that the matters brought up by the defendant "really relate to postjudgment matters," that they did not present an issue of conflict of interest, that if another lawyer is "ready to go forward" on the sentencing date, that lawyer could represent the defendant, and that, given the fact that there was no such other counsel "in the case at this time . . . your trial lawyer will be here with you on June 24 for sentencing . . . ." Sentencing occurred on June 24, 2005, with D'Amato representing the defendant.

On appeal, the defendant mounts an elaborate challenge to the court's ruling on May 20, 2005. As a legal matter, the defendant claims that under both the federal constitution and independently under the state constitution, she was denied her "counsel of choice and her rights as an indigent[10] to have counsel appointed . . . to remove incapable counsel, and to have substitute counsel appointed." As a factual basis for this legal claim, the defendant presents a long list of alleged inadequacies of trial counsel, some of which were, and many of which were not, presented to the trial court at the May 20, 2005 hearing. It is not necessary to detail here that list of claimed inadequacies.

It is clear that the factual basis of the defendant's legal claim is the assertion that her counsel did not

[10] Although on May 20, 2005, the defendant was still represented by two private counsel and a third private counsel had entered an appearance on her behalf, who had apparently withdrawn, the defendant asserts that "[i]n circumstances that included the defendant's historical indigency and [the court's] knowledge of retained counsel's incapability, the court should have conducted an adequate inquiry [into the defendant's indigency] and then appointed new counsel."

There are two short answers to this argument. First, there was nothing in the record, as noted, to suggest that the defendant was then indigent, and she made no such claim to the trial court. Second, the basis for her claim for new counsel rested on her claim of inadequacy of her then current counsel, a claim that must be presented by way of habeas corpus.

represent her in a constitutionally effective manner. Although the defendant has cast her legal claim in terms of a denial of her constitutional right to counsel of her choice, that claim rests entirely on her factual allegation that the counsel whom she did choose was ineffective, in a constitutional sense, to represent her.

Therefore, the reasoning of our Supreme Court in *State* v. *Leecan*, 198 Conn. 517, 541–42, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986), applies directly to the present case. In *Leecan*, the court held that claims of ineffective assistance of trial counsel should be presented by way of a habeas corpus petition because there can be an evidentiary hearing disclosing whether considerations of trial strategy were involved, and the counsel whose conduct is questioned will have an opportunity to testify. Id. In addition, such a claim may also require expert testimony regarding the quality of trial counsel's conduct. See, e.g., *Johnson* v. *Commissioner of Correction*, 34 Conn. App. 153, 158, 640 A.2d 1007, cert. denied, 229 Conn. 919, 644 A.2d 914 (1994). A limited exception to this procedural requirement that claims of ineffective assistance of counsel must be brought by way of habeas corpus exists when the defendant challenges the action of the trial court on the basis of claims of a conflict of interest by counsel, rather than the conduct of trial counsel, and when the issue presented is a question of law that may be decided on the basis of the existing record. *State* v. *Crespo*, 246 Conn. 665, 687–89, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).[11]

---

[11] Although not discussed by either party, we are aware that our determination that the claim is unreviewable may appear to be in tension with our determination in *State* v. *Wright*, 76 Conn. App. 635, 638–40, 820 A.2d 1111, cert. denied, 265 Conn. 902, 829 A.2d 421 (2003). That case is distinguishable, however.

In *Wright*, the defendant had moved, during trial, for a mistrial on the ground of alleged inadequate performance by counsel. The court performed an ineffective assistance of counsel analysis; see *Strickland* v. *Washington*,

In the present case, the defendant's factual challenges to the conduct of her trial counsel will require a full evidentiary hearing. A petition for habeas corpus is the appropriate forum for such a hearing. We decline, therefore, to consider this claim.

The judgment is affirmed.

In this opinion the other judges concurred.

466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); concluded that counsel's performance in the court was not constitutionally inadequate, denied the motion for a mistrial, and instead granted a continuance and allowed the defendant to retain new counsel. The defendant was subsequently convicted and, on appeal, argued that the court had improperly denied her motion for a mistrial. This court considered the appeal because, we noted, the "precise question" was not "whether the performance of counsel was deficient in some respect . . . but whether the court abused its discretion in denying the motion for a mistrial . . . ." *State* v. *Wright*, supra, 76 Conn. App. 640. Further, we noted that the factual predicate of the motion related to counsel's performance before the court and on the record, and that the court did not have to go beyond the record to make its determination.

In the present case, in contrast, although the defendant asserts that she is attacking only the determination of the court in denying her counsel's motion to withdraw, the factual allegations that the defendant relied on in support of that motion in the trial court consisted of as much off the record conduct as on the record conduct, and in her argument on appeal, she adds to the off the record incidents supporting her argument, thus disclosing the true nature of her complaint, i.e., that she was denied effective assistance of counsel pursuant to the sixth amendment, a claim that is more appropriate for review before a habeas court.